**OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.**

No. 86–1278.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1987.

Decided Aug. 14, 1987.

Donna Lampert, with whom Henry Geller, Washington, D.C., was on the brief for petitioners.

Daniel M. Armstrong, Associate General Counsel, F.C.C., with whom Jack D. Smith, General Counsel, C. Grey Pash, Jr., Counsel, F.C.C., John J. Powers, III and Donald S. Clark, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents.

Before WALD, Chief Judge, and MIKVA and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Dissenting opinion filed by Chief Judge WALD.

BORK, Circuit Judge:

Petitioners are organizations, representing various segments of the radio and television audience, that raise public interest issues through involvement in the broadcast licensing process before the Federal Communications Commission. They petition this court to review the Commission's Policy Statement on Tender Offers and Proxy Contests, 59 Rad.Reg.2d (P & F) 1536 (1986). The Policy Statement asserts that the Commission may temporarily exempt transfers of communications licenses resulting from tender offers and proxy fights from the "long-term" review that license transfers generally must receive under the Communications Act, 47 U.S.C. § 309 (1982). We hold that petitioners'

challenge to the Policy Statement is not ripe for judicial consideration and dismiss the petition for review.

### I.

### A.

An application under the Communications Act to transfer a communications license, in connection with a substantial change in ownership or control of a license holder, requires public notice of the application, a thirty-day minimum waiting period, an opportunity for others to file petitions to deny the application and for the applicant to reply, and a hearing on any substantial and material question of fact. 47 U.S.C. §§ 309, 310(d) (1982). In the Commission's view, this procedural scheme is ill-suited to a license transfer application arising from a contested attempt to acquire control of the corporate license-holder. In a contest for corporate control, speed, measured in days or hours, is typically essential to success. The relatively time-consuming procedures mandated by the Communications Act for license transfers are thus a handicap to bidders for corporate control. To address this problem, the Commission solicited comments through a Notice of Inquiry, FCC No. 85–349 (Aug. 20, 1985), Joint Appendix ("J.A.") at 1, which provided the Commission "the opportunity to consider our policies without the extraordinary press [of time] of any [particular contested bid for control]." Policy Statement on Tender Offers and Proxy Contests, 59 Rad.Reg.2d (P & F) 1536, 1538 (1986). The result of this consideration was the Policy Statement.

In the Policy Statement, the Commission claimed the power to postpone the long-form review process required by the Com-

munications Act for license transfer applications filed as a result of tender offers. It found this power in section 309(f) of the Act, 47 U.S.C. § 309(f) (1982), which permits the Commission to authorize a license application for a limited time without long-form review if the Commission "finds that there are extraordinary circumstances requiring temporary operations in the public interest and that delay in the institution of such temporary operations would seriously prejudice the public interest."[1] Policy Statement, 59 Rad.Reg.2d (P & F) at 1568–78. The Commission further suggested a likely structure for the Special Temporary Authority ("STA") it proposed to grant under section 309(f) in the tender offer setting: the trustee of an interim voting trust would, subject to various limitations, hold and vote shares of the target licensee tendered to the bidder, as well as oversee the target's operations, pending long-form review of the share transfer from trustee to bidder. *Id.* at 1562–68.

The Commission concluded the Policy Statement as follows:

> Finally, this *Policy Statement* is *intended to provide a framework* for the regulatory treatment of tender offers and proxy contests involving Commission licensees or companies with controlling interests in Commission licensees. The adoption of *this Policy Statement,* however, *is not intended to foreclose the Commission, in a particular proceeding, from adopting a different approach if warranted in specific circumstances.*

59 Rad.Reg.2d (P & F) at 1584 (emphasis added). *See also In re MacFadden Acquisition Corp.,* 104 F.C.C.2d 545, 547, 560 (1986) (Policy Statement "reinforced and

---

1. 47 U.S.C. § 309(f) (1982) states:

When an application subject to subsection (b) of this section has been filed, the Commission, notwithstanding the requirements of such subsection may, if the grant of such application is otherwise authorized by law and if it finds that there are extraordinary circumstances requiring temporary operations in the public interest and that delay in the institution of such temporary operations would seriously prejudice the public interest, grant a temporary authorization, accompa-

nied by a statement of its reasons therefor, to permit such temporary operations for a period not exceeding 180 days, and upon making like findings may extend such temporary authorization for additional periods not to exceed 180 days. When any such grant for a temporary authorization is made, the Commission shall give expeditious treatment to any timely filed petition to deny such application and to any petition for rehearing of such grant filed under section 405 of this title.

refined the rulings in [Commission's] adjudicatory cases" and "was intended as a general guideline" in which Commission "recognized" that "specific cases might require a degree of flexibility").

### B.

Petitioners contend that tender offers are not "extraordinary circumstances requiring temporary operations in the public interest," within the meaning of section 309(f). They also claim that what "would seriously prejudice the public interest" is not the "delay in the institution of such temporary operations" that the STA procedure purportedly avoids but the attempt to avoid delay in the tender offer setting through the STA procedure itself.

According to petitioners, neither the language nor the legislative history of section 309(f) permits the Commission to characterize tender offers as "extraordinary circumstances requiring temporary operations in the public interest" because tender offers are not "extraordinary" numerically and do not affect "operations" pursuant to a license. But petitioners primarily argue that the STA arrangement proposed in the Policy Statement would prejudice the public interest by frustrating petitioners' legally protected ability under sections 309(d) and 310(d) of the Act to bring a petition to deny the license transfer from the target license holder to the bidder by reference to the target's past operations. *See California Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 830–31 (D.C.Cir.1985) (Wald, J., dissenting). Such a petition to deny would arise in one of two situations: (1) the target's operations were deficient, such that the target's right to its license has effectively lapsed and it has nothing to

transfer; or (2) the target's operations have been superlative, and the bidder's future operations promise to be materially lower in quality. The Commission's grant of an STA under section 309(f) by its terms is exempt from the petition to deny permitted by a long-form proceeding; in the subsequent long-form proceeding not the target but the trustee is the licensee. Since section 310(d) of the Act expressly prohibits reference in a transfer proceeding to operations by any person other than the licensee or the proposed licensee, *see WNCN Listeners Guild v. FCC*, 610 F.2d 838, 852 n. 37 (D.C.Cir.1979) (en banc), the Commission's proposed procedure therefore renders impossible any reference to the target's operations in a petition to deny. Petitioners also claim that the trustee's "caretaker" management of the target under the STA could have adverse effects on its programming, and that the difficulties of unwinding a transaction once the STA has been granted will unduly prejudice the Commission in favor of granting the bidder's proposal long-form approval.

### II.

■ We do not address the merits of petitioners' contentions because we find that their petition is not ripe for review.[2] The test for ripeness has two main parts: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Petitioners' challenge to the FCC's Policy Statement satisfies neither part of this test.[3] We first address the fitness of the issues for decision.

---

**2.** Although the Commission as well as petitioners take the view that petitioners' challenge is ripe, this court has the power to raise the issue on its own, even when the question before the court is sufficiently ripe to be an article III "case or controversy" but simply appears to fail the prudential criteria for ripeness. *See, e.g., American Trucking Ass'ns v. ICC*, 747 F.2d 787, 789–90 (D.C.Cir.1984). Accordingly, we need not address whether or not the lack of ripeness here implicates article III.

**3.** In addition to considering the treatment of tender offers, the Commission also determined in the Policy Statement that it would typically handle proxy contests that will not result in a substantial change in corporate control through the use of the expedited procedures approved by this court in *Storer Communications, Inc. v. FCC*, 763 F.2d 436 (D.C.Cir.1985). 59 Rad. Reg.2d (P & F) at 1541–52. With respect to this issue, which petitioners also ask us to review, we agree with the Commission's statement that "petitioners' complaint is really one about hypothetical future applications of the [proxy con-

## A.

■ The clearest instance of an issue unfit for judicial decision is one that turns wholly on an open question of fact rather than law. But the presence of a "purely legal question" is not enough, of itself, to render a case ripe for review, not even as to that issue. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), concerned a challenge to regulations that permitted the Commissioner of Food and Drugs to suspend his certification of a manufacturer's drug additives as suitable and safe until the manufacturer allowed FDA employees to inspect pertinent manufacturer facilities and data. The Court conceded that the challenged agency regulation was final agency action and that petitioners' challenge there presented the purely legal question of "whether the regulation is totally beyond the agency's power under the statute." *Id.* at 162–63, 87 S.Ct. at 1523–24. The Court nonetheless found the issue not fit for review, because the agency had not bound itself to follow the course of conduct challenged, but had stated only that it might do so. *Id.* at 163–64, 87 S.Ct. at 1524–25.

This circuit has provided a general explanation of why review of a discretionary agency position is often best postponed to a specific application of the position:

> A facial, purely legal challenge is both more difficult and less worthwhile when the [regulatory] prescription challenged is discretionary. To hold the provision invalid on its face, a court would have to conclude that the provision stands in conflict with the statute regardless of how the agency exercises its discretion. Before so ruling, a court would be obliged to perceive and consider the various ways in which the agency might use its discretion.

*Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 941 (D.C.Cir.1986).

■ The Commission argues that this court has often reviewed its policy statements, citing as examples the decisions of this court and the Supreme Court in *WNCN Listeners Guild v. FCC*, 610 F.2d 838 (D.C.Cir.1979) (en banc), *rev'd*, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981). But ripeness was not an issue in the *WNCN* decisions; consequently they provide no guidance to us regarding this threshold jurisdictional issue. *Cf. Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984) (no precedential value to decisions that assume standing to sue without discussion). More important, whether an agency decision is labelled a "Rule" or a "Policy Statement" is of no consequence to the ripeness of the decision for review. Since the court reviews not the label but the agency pronouncement that underlies the label, it is that pronouncement itself that governs the determination of its status. *See Baltimore Gas & Elec. Co. v. ICC*, 672 F.2d 146, 149 (D.C.Cir.1982) (ripeness not precluded simply because agency order "interpretive"); *see also General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc) (agency's label not dispositive of whether statement is interpretive or legislative rule).

In the case before us, the Commission has used the STA procedure in past adjudications of tender offers for licensees (none of which has been reviewed by this court). *See* 59 Rad.Reg.2d (P & F) at 1538 n. 2; *see also In re MacFadden Acquisition Corp.*, 104 F.C.C.2d 545 (1986) (referring to Policy Statement in denying bidder STA). We thus are not faced with a serious doubt as to whether the Policy Statement's position will *ever* translate into action at all. But we are faced with doubts about *how* the Commission may make that translation in a case that reaches this court. The Policy Statement does not propose the automatic grant of an STA for every tender offer, but simply outlines a framework for the Commission's exercise of its discretion in this area. Indeed, the Commission has clearly indicated that it does not intend the Policy

---

test] policy." Brief of Respondents at 13. We find that petitioners' challenge regarding proxy contests is not ripe, for reasons analogous to

those in the text regarding the other aspects of their appeal.

Statement to bind the Commission to do anything in any particular proceeding. 59 Rad.Reg.2d (P & F) at 1538, 1584; *MacFadden Acquisition*, 104 F.C.C.2d at 560. (We note that after issuance of the Policy Statement the Commission in its *MacFadden Acquisition* decision denied a bidder's application for an STA.)

Were we to decide the issue of statutory authority now, as framed by the parties, we would have to decide whether no tender offer or every tender offer would fit under section 309(f). But the correct answer to this question—and perhaps even the Commission's ultimate legally binding answer— could also be "some." This court might well find that whatever tender offers ultimately come before it are "extraordinary circumstances requiring temporary operations in the public interest" within the meaning of section 309(f), although other offers would not be. Conversely, our decision here could result in a particular offer's later being deemed, by the Commission or by this court, not to fall within the section 309(f) postponement of long-form review, although it might have been found otherwise if approached on its particulars in the first instance. We are not here presented with a case that enables us to reflect the complexities underlying tender offers for communications licensees in any meaningful way.

The specific statutory provision we must construe, moreover, section 309(f), rests on the same discretionary "public interest" standard that governs long-form review. *Compare* 47 U.S.C. § 309(f) (1982) ("extraordinary circumstances requir[e] temporary operations in *the public interest*"; delay of such operations "would seriously prejudice *the public interest*") (emphasis added) *with id.* §§ 309(a) (Commission shall grant application if *"public interest, convenience and necessity* would be served") (emphasis added), 310(d) (same as to license transfer applications), 309(d)(1) (petition to deny must show "prima facie inconsisten[cy] with [public interest, convenience and necessity]"). As both *Toilet Goods*, 387 U.S. at 163–64, 87 S.Ct. at 1524–25, and our *Action Alliance* decision, 789 F.2d at 941, show, judicial review of a challenge to

an agency's assertion of discretionary authority under a statute is typically best postponed to the exercise of that authority.

Even apart from the statute's "public interest" standard, resolution of petitioners' assertion that license transfers pursuant to tender offers are not "extraordinary circumstances requiring temporary operations" exempt from long-form review would require this court to explore in depth the long-term review under section 309 from which the Commission plans to exempt tender offers temporarily. The need for this inquiry is shown by *Toilet Goods*, where the Court stated that petitioners' challenge raised the question of "whether the statutory scheme as a whole justified promulgation of the regulation" and found that the breadth of such a question would be best focused by judicial review of a particular application of the regulation. 387 U.S. at 163–64, 87 S.Ct. at 1524–25. Similarly, an assessment of the consistency between the structure and purposes of long-form review and the Commission's invocation here of the section 309(f) exception to that review implicates a large part of the Communications Act, not just section 309(f), and would be greatly improved by the presentation of a particular transfer application.

In addition, the crucial injury that petitioners assert would result from the postponement of long-form review may never occur. The Commission suggested at oral argument that it may no longer permit trial of the target licensee's high quality of service in a transfer hearing, and that the Commission's interpretation of section 310(d) of the Act in *Wichita-Hutchinson Co.*, 20 F.C.C.2d 584 (1969), on which petitioners relied for this point, may no longer be good law. The Commission also suggested at argument that reference to the target licensee's low quality of service would probably be available *via* an accelerated license renewal proceeding, but this, too, is not altogether clear. The Commission in the Policy Statement did not address at all the question of reference to the target transferor's prior good or bad ser-

vice.[4] But, since section 309(f) requires the STA to be "otherwise authorized by law," in reviewing the Policy Statement this court would be unavoidably constrained to assess whether an STA resulting from a tender offer would comport with the "law" embodied in *Wichita-Hutchinson's* interpretation of section 310(d), and hence to assess whether the rule of that case remains good law. Review of a challenge to the Policy Statement based principally upon this evanescent injury to petitioners would be inappropriate, since we simply do not know whether the Commission will now allow any reference to the transferor's quality of service, or in particular whether the Commission indeed will find that *Wichita-Hutchinson* is no longer to be followed. Obviously, we should not anticipate the Commission and render an advisory opinion as to whether the Commission's hypothetical overruling of *Wichita-Hutchinson* would be upheld by this court.

■ In short, analysis of the Commission's statutory authority to exempt tender offers from the long-form review required by sections 309 and 310(d) necessarily turns on our understanding of what the purposes and essential elements of long-form review are. But to obtain that understanding, we would necessarily have to resolve the question of what the Commission's current position is, and what section 310(d) requires, as to the need in a long-form proceeding to consider the target transferor's quality of service. We are in no position to resolve that question—indeed, the Commission itself has not resolved it. For this reason alone, the issues in this case are not ripe for review.

Many other aspects of the issues in this case remain obscure. It is unclear when the STA procedure may be invoked by a bidder for a licensee. The Commission in-

dicates it is available whenever a transfer application may be filed, which apparently turns on the question, by no means easy, of whether the bidder has acquired *de jure* or *de facto* control of the licensee. *See* 59 Rad.Reg.2d (P & F) at 1552 n. 76; *see also Storer Communications, Inc. v. FCC*, 763 F.2d 436, 442 (D.C.Cir.1985) (resolving question of corporate control is "a complex task which must be done on a case-by-case basis"). But many of the prejudicial results petitioners complain about, such as the difficulty of unwinding an acquisition of which the Commission ultimately disapproves or the adverse effects of "caretaker" management by the trustee, may well vary with the timing of the trustee's appointment and the number of shares (and hence degree of control) the trustee holds. The trustee's degree of control could vary significantly from case to case. For example, in a gradual buy or "creeping control" acquisition, when the bidder through various distinct share purchases gradually acquires control of the target, the trustee apparently would hold only the final, marginal share purchase that would otherwise give the bidder control. *See* Notice of Inquiry at 13, J.A. at 13. An additional question is the extent to which the trustee might, in his capacity as interim controlling shareholder, act in ways that contravene the special restrictions on his managerial or operational authority that the Commission proposes in the Policy Statement. The answer to this question is clouded by the fact that such matters are usually governed by state corporate and trust law. *Compare* Notice of Inquiry at 12 n. 14, J.A. at 12 n. 14 (suggesting that since Commission "does not administer" controlling law, it should "have no role" in trustee's acts as shareholder) *with* 59 Rad.Reg.2d (P & F) at 1581 (suggesting that trustee's duty to

---

4. Commission counsel also suggested at argument that petitioners had not raised this point before the Commission. In its summary of comments appended to the Policy Statement, however, the Commission quoted petitioners here as requesting the Commission to " 'make a finding in each case that the proposed new licensee will *affirmatively add* to service to the public,' " and paraphrased petitioners further as urging the Commission to "require a showing of

*present* levels of public service programming and expenditures." 59 Rad.Reg.2d (P & F) at 1592 (emphasis added). These comments certainly raise the question of reference to the target transferor's operations in the transfer proceedings. Indeed, in their comments to the Commission on this point petitioners expressly relied upon the *Wichita-Hutchinson* decision. Comments of UCC, *et al.* at 30, J.A. at 125.

Commission overrides contractual and fiduciary duties to the offeror). The Policy Statement raises more questions than it answers about these numerous uncertainties. Each would surely be focused if not dispelled in a particular proceeding. Their presence here also counsels against our review of the legality of the Commission's positions in the Policy Statement.

One might at first blush believe that the question of whether the Commission's Policy Statement is consistent with the plain language of section 309(f) is ripe for our review. We are satisfied, however, that section 309(f) is not detachable from the balance of that section or from section 310(d). Consequently, we preserve "our own ability to decide intelligently," *American Trucking Ass'ns v. ICC,* 747 F.2d 787, 790 (D.C.Cir.1984), by recognizing that the issues in the case before us are not yet fit for judicial review.[5]

### B.

Given that the issues in this case are not fit for review at this time, consideration of

possible hardship to the parties from postponing review (the second part of the *Abbott Laboratories* standard for ripeness) also compels the conclusion that this case is not ripe for review.[6]

■ Petitioners urge that postponement of review in this case will impose hardship on them. Since the STA eliminates the thirty-day waiting period in which to file petitions to deny, petitioners apparently argue that, absent judicial review now, their limited resources will prevent them from quickly performing a planned and coordinated investigation of and decision on opposition to a license transfer involving the STA procedure. Petitioners rely heavily on *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), to support their claim of hardship. *Storer* concerned FCC regulations limiting the number of broadcast licenses that one entity could hold. Storer alleged that the rules would limit its ability to acquire additional stations. The Supreme Court held

---

**5.** We stress that we in no way suggest that the ultimate holding of this court in a genuinely ripe case could not be that § 309(f) permits all tender offers or no tender offer to fall within its ambit. Rather, the point is that the issues in this case are not yet fit for decision, whatever the correct resolution of those issues may be. A leading treatise on federal jurisdiction succinctly summarizes our position:

A determination to require development of more specific facts, or more comprehensive exposition of an [agency's position on questions of] law, is not inconsistent with eventual adjudication on the basis of broad principles that make the details irrelevant. It is legitimate to defer choice between broad general rules and more particularistic rules until experience is available with the difficulties of attempting particularistic distinctions on the fully developed details of an individual case. A finding that the issue is not ripe, accordingly, need not amount to a tacit prejudgment against a broad rule that could have been applied to the case as initially presented. Thus a facial attack on a statute may be found not ripe in terms that rely on the need for more factual detail, and at the same time leave the way open to hold the statute invalid on grounds that do not depend on the factual information once it is provided.

13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532.3, at 150–51 (2d ed. 1984) (footnotes omitted).

The Supreme Court has offered a precisely analogous explanation for deferring review in the constitutional context:

[Actual] circumstances may be critical for constitutional determination. It will not do to discount their significance by saying, now, that no difference in circumstances will effect a different constitutional result—that the principles relevant to a determination of the validity of these statutory provisions do not depend upon the variations in circumstances in which they are potentially applicable. For this analysis presupposes that we now understand what are the relevant constitutional principles, whereas the reason of postponing decision until a constitutional issue is more clearly focused by, and receives the impact from, occurrence in particular circumstances is precisely that those circumstances may reveal relevancies that abstract, prospective supposition may not see or adequately assess.

*Communist Party v. Subversive Activities Control Bd.,* 367 U.S. 1, 78, 81 S.Ct. 1357, 1400–01, 6 L.Ed.2d 625 (1961).

**6.** We express no opinion on the extent to which ripeness analysis requires the court to balance the fitness of the issues against the hardship to the parties, *see Eagle-Picher Indus. v. United States Environmental Protection Agency,* 759 F.2d 905, 918 (D.C.Cir.1985), but simply conclude that this case is unripe in any event since the issues are unfit and there is no hardship to the parties.

the challenge ripe for review, essentially because Storer could not enlarge the number of its stations by virtue of the rules, which "operate[d] to control the business affairs of Storer" and prevented Storer from "cogently plan[ning] its present or future operations." 351 U.S. at 199–200, 76 S.Ct. at 768–69 (footnote omitted).

But the *Toilet Goods* decision shows that *Storer* is of no help to petitioners here. The Supreme Court in *Toilet Goods* distinguished its *Storer* decision as involving an "impact of the administrative action [that] could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." 387 U.S. at 164, 87 S.Ct. at 1524–25. In contrast, the situation of the *Toilet Goods* petitioners was "not a situation in which primary conduct is affected—when contracts must be negotiated, ingredients tested or substituted, or special records compiled." *Id.* The petitioners here are in exactly the same position as the *Toilet Goods* petitioners. Petitioners' planning or preparation is not in any way inhibited by the Policy Statement. To protect their ability to plan and prepare, petitioners need only challenge the next STA application, claiming that they are entitled to the time given by a long-form proceeding to decide whether they wish to challenge the transaction on the merits. That being so, there seems no hardship here. Petitioners already have that legal challenge prepared. And in any event petitioners' inability to plan, of itself, would not distinguish the hardship they allege from the "planning insecurity" in "the mine run of situations in which an enterprise confronts official interpretations and policy statements regarding projected application of regulatory or fiscal legislation." *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 751 (D.C.Cir.1984).[7] As in *Toilet Goods,* no irremediable ad-

verse consequences would flow from this court's requiring a later challenge to the Commission's refusal to require immediate long-form review in a particular tender offer. That decision "can then be promptly challenged through an administrative procedure, which in turn is reviewable by a court." 387 U.S. at 165, 87 S.Ct. at 1525 (footnotes omitted); *see Tennessee Gas Pipeline Co.,* 736 F.2d at 751. It is also irrelevant that the Commission might in a particular proceeding refuse to consider a challenge to the statutory authority for its decision, since the reviewing court would consider the challenge in any event. *See* 387 U.S. at 165–66, 87 S.Ct. at 1525–26; *American Trucking Ass'ns,* 747 F.2d at 790–91; *Baltimore Gas & Elec. Co.,* 672 F.2d at 150. The fact that particular applications of the Commission's position might involve extreme time pressures has no relevance. As petitioners admit in their brief, this court routinely handles appeals that occur under extreme time pressure; litigants such as petitioners routinely participate in such appeals. *See Storer Communications Corp. v. FCC,* 763 F.2d 436 (D.C. Cir.1985) (expedited disposition of appeal from Commission decision in proxy fight with public-interest-group intervenors). Finally, even if a particular transfer proceeding became moot before this court had the opportunity to give it plenary consideration, there is a strong possibility that the court would still be empowered to address the case as one capable of repetition yet evading review. *See, e.g., Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (review of labor dispute that ended before suit filed).[8]

■ It is true that the refusal to review the Policy Statement now might deter tender offers for communication licensees, since potential bidders may fear that this

---

7. The Commission itself asks this court to review this case now, in part because the Commission wishes to know whether its tender offer policy is legal. But a party's bare desire to obtain a ruling cannot, in and of itself, make a case ripe for review. And the Commission's desire to obtain a ruling to facilitate its administrative planning is answered by the text's response to petitioners' desire to plan.

8. In fact, notwithstanding the hardship they allege here, petitioners did seek participation in a particular STA proceeding following issuance of the Policy Statement. *See MacFadden Acquisition,* 104 F.C.C.2d at 546 n. 1. As noted in the text, the Commission's refusal to consider their comments, *id.,* does nothing to prejudice petitioners' ability to raise all of their contentions on appeal to this court.

court upon review of their bids might require immediate long-form review by the Commission. But this is not a hardship shared by any party to this case, and so we may not consider it. *See State Farm Mutual Auto. Ins. Co. v. Dole*, 802 F.2d 474, 482 (D.C.Cir.1986); *South Carolina Elec. & Gas Co. v. ICC*, 734 F.2d 1541, 1546 (D.C.Cir.1984).

The petition is dismissed for want of ripeness.

*It is so ordered.*

WALD, Chief Judge, dissenting:

I would find that petitioners' facial challenge to the Policy Statement of the Federal Communications Commission (FCC) is ripe for review. I believe that the precedent of this court mandates a somewhat different framework for analyzing ripeness than the majority opinion uses and that under the proper framework, we should go ahead and hear the case on the merits.

## I. THE FRAMEWORK FOR RIPENESS ANALYSIS

When a party brings a pre-enforcement challenge to an administrative regulation or policy statement, the first question for the court is whether the claim "presents a purely legal question." *Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967); *Better Government Association v. Department of State*, 780 F.2d 86, 92 (D.C. Cir.1986). If it does, the court must weigh any interests in favor of deferring review until the agency applies its rule or policy in a particular enforcement proceeding, against any interests in favor of resolving the purely legal question immediately. Usually, the Court divides this prudential balancing into two separate stages. The court first considers the institutional interests of both the court and agency in favor of postponing or proceeding with review. If the court concludes that these institutional interests, taken in their entirety, militate toward postponing review, the court then goes on to consider whether the hardship from postponement to the party bringing the legal challenge outweighs those countervailing institutional interests. *See,*

*e.g., State Farm Mutual Automobile Insurance Co. v. Dole*, 802 F.2d 474, 479–81 (D.C.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987); *Better Government*, 780 F.2d at 92; *see also ACLU v. FCC*, 823 F.2d 1554, 1582 (D.C. Cir.1987) (Edwards, J., concurring) (under prudential ripeness doctrine, court defers review when "institutional interests favor deferral and the petitioners are unable to demonstrate sufficient 'hardship' to outweigh those interests").

"Hardship to the parties," however, is not an independent requirement for a claim to be ripe. If the institutional interests of the court and agency, in the aggregate, favor immediate review, then the claim will be ripe notwithstanding the fact that postponement of review would not cause significant hardship to the party bringing the action. *See Eagle-Picher Industries, Inc. v. EPA*, 759 F.2d 905, 918 (D.C.Cir.1985). Of course, the party must satisfy any applicable statutory or constitutional injury requirement in order to have standing to challenge the agency rule, *see, e.g., Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), but the "hardship" element of the ripeness analysis developed in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), was never intended and has never been understood to constitute a separate burden, requiring a party to show an additional quantum of injury before the court will address the merits of the party's legal claim. In *Eagle-Picher*, the court explained why hardship is not an independent requirement, but rather is simply a factor in the prudential ripeness balance:

> If we were to defer review ... merely because we could find no significant harm to petitioner from delay, we would achieve the perverse result of postponing review to the detriment of the agency and the court ... in the name of a prudential doctrine that is intended to protect the institutional needs of courts and agencies.

759 F.2d at 918. We have very recently reaffirmed our precedent that prudential ripeness does not demand a special show-

ing of hardship when the institutional interests favor immediate review. *Consolidation Coal Co. v. FMSHRC*, 824 F.2d 1071 (D.C.Cir.1987); *see also id.* (Edwards, J., concurring) ("I write only to emphasize ... that a litigant must demonstrate 'hardship' *only* when necessary to outweigh institutional interests that militate in favor of deferral of review.") (emphasis in original); *but see id.* (D.H. Ginsburg, J., dissenting) ("hardship" from postponing review is an independent requirement of ripeness law).

## II. APPLICATION OF THE RIPENESS ANALYSIS TO THIS CASE

This case presents the same kind of "purely legal question" that was involved in the *Toilet Goods* case: "whether the regulation is totally beyond the agency's power under the statute." 387 U.S. at 163, 87 S.Ct. at 1524. Here, petitioners argue that the Policy Statement governing tender offers is entirely outside the authority of the Federal Communications Commission under 47 U.S.C. § 309(f).[1] As this is "the type of legal issue that [may sometimes be decided] without requiring a specific attempt at enforcement," *Toilet Goods*, 387 U.S. at 163, 87 S.Ct. at 1524, this court must weigh the interests for and against immediate review.

The majority is correct in identifying certain reasons why the court might wish to delay review until the Policy Statement is applied to a particular tender offer. Like the regulation in *Toilet Goods*, the Policy Statement here does not bind the agency in all circumstances. Thus, the FCC may apply its novel trustee procedures to some tender offers and not others. The court might benefit from learning what circumstances occasion the use of this mechanism, as well as the reasons the agency relies on for invoking it.

Nevertheless, it must be said that the FCC's Policy Statement contemplates much less discretion in its application than did the regulation at issue in *Toilet Goods*. There, "[t]he regulation serve[d] notice

only that the Commissioner *may* under certain circumstances order inspection of certain facilities and data, and that further certification of additives *may* be refused to those who decline to permit a duly authorized inspection until they have complied in that regard." 387 U.S. at 163, 87 S.Ct. at 1524 (emphasis in original). In our case, the Policy Statement says that "in the context of a tender offer, ... [the FCC] *will* grant an STA [special temporary authority] to a qualified, independent trustee with power to consummate the tender offer...." J.A. at 81 (emphasis added). The Policy Statement adds, however, that it "is not intended to foreclose the Commission, in a particular proceeding, from adopting a different approach if warranted in specific circumstances." *Id.* Although not mandatory, the Policy Statement sets up a strong presumption that the trustee mechanism will be used. It was evidently the intent of the FCC to apply the Policy Statement to tender offers generally. *See* Supplemental Brief of FCC at 11. In this respect, then, this case differs significantly from *Toilet Goods*.

While the Supreme Court in *Toilet Goods* thought that "judicial appraisal" of the statutory issue presented was "likely to stand on a much surer footing in the context of a specific application of th[e] regulation," 387 U.S. at 164, 87 S.Ct. at 1524–25, I respectfully submit that our evaluation of petitioners' claim "would not be enhanced" materially by the application of the Policy Statement to a particular tender offer. *Better Government*, 780 F.2d at 93. Petitioners contend that in adopting the Policy Statement, the FCC acted entirely beyond the scope of its statutory authority because tender offers cannot qualify as "extraordinary circumstances requiring temporary operations" of a broadcast facility. 47 U.S.C. § 309(f). Tender offers, they argue, simply are not among the kind of events, like natural disasters or national security threats, for which Congress granted the FCC limited authority to suspend regular statutory procedures in order to

---

1. The petitioners also challenge the FCC's new procedures for proxy contests. This challenge, however, is precluded by our decision in *Storer*

*Communications, Inc. v. FCC*, 763 F.2d 436 (D.C. Cir.1985) (per curiam).

inform members of the community about the potential danger.

I find it difficult to imagine how our resolution of *this* legal claim will be "facilitated by further factual development." *Better Government,* 780 F.2d at 92. The issue of congressional intent in this case does not depend on any facts about tender offers that are not already in the record. Section 309(f) either is or is not limited to occasions which require "temporary broadcast operations" to keep the public informed of major events, like hurricanes. *See* Brief of Petitioners at 16 n. 7. We are already informed enough about tender offers to know that, unlike hurricanes, they are not the kind of events about which communities must be kept informed by broadcast facilities. Thus, if tender offers can ever qualify as "extraordinary circumstances" within the meaning of § 309(f), it must be because the statutory use of the term is not as limited as petitioners argue that it is. I believe that it is entirely possible for us to decide this question of statutory interpretation now. Petitioners' *facial* challenge to the Policy Statement is, therefore, "fit" for immediate review. *See Better Government* at 92–93 n. 33.

Moreover, this case, unlike *Toilet Goods,* contains institutional interests that weigh in favor of immediate review. The FCC itself urges this court to find this case ripe because "review of the Commission's policy in the context of a particular application, under the severe time pressures that would be inevitable . . ., would be far more disruptive [to the FCC's administration of its policy] than reviewing the *Policy Statement* at this time." Supplemental Brief of FCC at 13. In this case, the FCC has an important interest in determining the legal validity of the trustee mechanisms in advance: the very market that it regulates may be affected by legal uncertainty. The Policy Statement represents an important administrative effort to cope with an in-creasingly vexing problem. In order to assess its own administrative agenda, including efforts to enact new legislation, the FCC needs to know the validity of this approach as soon as possible. To the extent that ripeness law is designed to protect administrative agencies from premature judicial interference, *see Abbott Laboratories,* 387 U.S. at 148, 87 S.Ct. at 1515, this interest is not at all threatened by immediate judicial review in this case.

In large measure, this court shares with the FCC its interest in an immediate adjudication of petitioners' claim. The inevitable time sensitivity of tender offers at best will require the court to act with haste when faced with a facial challenge to the validity of the trustee mechanism in the context of a particular tender offer. *Cf. Storer Communications, Inc. v. FCC,* 763 F.2d 436 (D.C.Cir.1985) (per curiam) (expedited consideration of FCC decision to apply "short-form" procedures to particular proxy contest).[2] Indeed, the particular tender offer may become moot before the court ever gets a chance to rule on the merits, leaving this court no better off than it is today. *See* Supplemental Brief of FCC at 9–10.

In sum, while I recognize that this court may have some interest in denying this pre-enforcement challenge, the balance of institutional interests seems to weigh decidedly in favor of immediate review. Given this outcome, it is irrelevant if the petitioners' interest in immediate review adds little, if any, weight to that side of the scale. The majority does not contend that petitioners lack the minimum requisite "injury" to establishing standing to challenge the FCC's Policy Statement. The justiciability issue here is simply whether the court ought to hear the case now or later. Since the statutory interpretation issue presented is suitable for immediate judicial resolution and there are good reasons for conducting that review now, the ripeness inquiry should come to an end.[3]

---

2. In *Storer,* the FCC issued its order on April 22, 1985. Oral argument before this court was heard on May 2, and we affirmed the FCC's decision the same day. A per curiam opinion explaining our decision followed twelve days later.

3. "Because we have determined that the [FCC] and, to a lesser extent, the court ha[s] a *positive interest* in review [at this time], there are no conflicting interests to balance." *Eagle-Picher,* 759 F.2d at 918 (emphasis in original).

### III. A FURTHER OBSERVATION

The majority, however, finds petitioners' claim unfit for immediate review and does not share my view that both the agency and the court have a legitimate and important *positive* interest in deciding petitioners' facial challenge at this time. Given that position, I recognize that, under traditional ripeness law, the majority must go on to consider whether petitioners have demonstrated sufficient hardship from postponing review to outweigh the countervailing considerations. Thus, although under my analysis, which finds the issue fit for review, there would be no need to show additional hardship, I wish to respond to one troubling aspect of the majority's hardship analysis.

The majority relies, in part, on the "primary conduct" test articulated in *Toilet Goods* to reach its conclusion that petitioners are unable to show sufficient hardship. 387 U.S. at 164, 87 S.Ct. at 1524–25. The use of the standard "primary conduct" test as the determiner of hardship in the context of this case makes little sense legally or in the real world. *Toilet Goods* involved a challenge to agency rulemaking by a regulated entity. In contrast, the challenge here has been brought by the intended beneficiaries of a statutory scheme. Agency rulemaking will never affect the "primary conduct" of statutory beneficiaries in the same way that it often affects the "primary conduct" of regulated entities. Yet statutory beneficiaries have the right to seek judicial relief when their legally protected interests are harmed by unlawful agency action.

Thus, the "primary conduct" test, developed in the context of a pre-enforcement challenge brought by a regulated entity, is not well-suited for judging the ripeness of a pre-enforcement challenge brought by a statutory beneficiary. This court has previously attempted to redefine "primary conduct" in such a way that the term can apply to the activities of "public interest" groups that represent the interest of the members. *See Better Government,* 780 F.2d at 93–94.[4] It certainly seems, whatever the formula, that courts must recognize a way for statutory beneficiaries who do not run businesses to demonstrate "hardship" from postponing a pre-enforcement challenge. It does not take much conjuring to think of circumstances in which nonregulated statutory beneficiaries would have a strong interest in immediate judicial review of their pre-enforcement challenge.[5]

I fear that the majority's application of the usual "primary conduct" test in its "hardship" analysis here would prevent such groups in virtually all cases from meeting the second prong of the ripeness analysis. Thus, I do not share its reasoning. Because, however, I find the institutional interests in this case warrant immediate review, neither do I find it necessary to decide exactly how the "hardship" element should be analyzed in a case like this where a pre-enforcement challenge to agency rule-making is brought by a listening group rather than a regulated entity. That effort can await another day.

### CONCLUSION

For the reasons I have set forth, I respectfully dissent from the panel's decision that the facial challenge of the tender offer Policy Statement is not ripe for review.[6]

---

**4.** These groups often are organized to represent the intended beneficiaries of a particular statutory scheme.

**5.** For example, if a senior citizens' interest group claimed that the FDA's regulations prescribing inspection standards for drug manufacturer facilities were unlawfully inadequate, the senior citizens who must take medications regularly have a strong interest in an immediate determination of the validity of the regulations, even if it cannot be said that they would change their "primary conduct" in any way, depending upon whether their legal claim is decided in a pre-enforcement challenge or in the context of an enforcement proceeding against a particular drug manufacturer.

**6.** Were the panel to reach the merits, I would hold that the FCC's new policy with respect to tender offers goes beyond its statutory power under § 309(f), the only statutory provision on which it relies as authority for the trustee mechanism. Based on my reading of the language

and the legislative history of this section, I be-
lieve Congress intended § 309(f) to be used only
when the FCC needed to put or keep broadcast
stations in operation temporarily so that they
might inform citizens of impending disasters or
"extraordinary" political events. I cannot con-
clude that Congress intended to allow the FCC
to invoke its "safety-value" authority of § 309(f)
merely because it found the regular statutory
"long-form" procedures were too cumbersome
for broadcast license transfers resulting from a
tender offer. Even if the FCC's new tender

offer procedures might be extremely wise as a
matter of policy, this court is bound by the plain
language and clear intent of Congress. *See INS
v. Cordoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207,
94 L.Ed.2d 434 (1987); *Board of Governors v.
Dimension Financial Corp.*, 474 U.S. 361, 106
S.Ct. 681, 88 L.Ed.2d 691 (1986). Because of the
majority's disposition of this case on ripeness
grounds, I do not elaborate further on the mer-
its. *See California Ass'n. of the Physically Hand-
icapped v. FCC*, 778 F.2d 823, 834 n. 17 (D.C.Cir.
1985) (Wald, J., dissenting).