**STUDENT PRESS LAW CENTER, Lyn D. Schrotberger, Sam G. Cristy, and James C. Brewer, Plaintiffs,**

v.

**Hon. Lamar ALEXANDER, Secretary, Department of Education, and United States Department of Education, Defendants.**

Civ. A. No. 91–2575 SSH.

United States District Court, District of Columbia.

Nov. 21, 1991.

Richard D. Marks, Alison A. Lowe, Washington, D.C., for plaintiffs.

Elizabeth Ann Pugh, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

Now before the Court is plaintiffs' motion for a preliminary injunction. On consideration of the entire record, the Court grants plaintiffs' motion.

This action challenges a provision of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C.A. § 1232g (1990 & Supp.1991).[1] Plaintiffs are three student journalists and a not-for-profit corporation that promotes the legal rights of the student press. Defendants are the Secretary of Education (Secretary) and the Department of Education (DoE), which enforces the FERPA. Plaintiffs challenge a provision of the FERPA that empowers the DoE to withdraw federal funding from a univer-

---

**1.** The statute is also known as the Buckley Amendment.

**2.** An exception to this rule permits an institution to disclose records directly to the public

sity that has a policy or practice of disclosing to the public personally identifiable information in the arrest and incident reports of campus police. Plaintiffs allege that the subject portion of the FERPA violates their Fifth Amendment right to equal protection and their First Amendment rights to free speech and freedom of the press. They seek an order enjoining the defendants from further enforcing the statute.

### Background

1. The FERPA

■ Congress enacted the FERPA in 1974. Pub.L. No. 90–247, Title IV, § 438, 88 Stat. 571 (1974). The statute's apparent purpose is to ensure access to educational records for students and parents and to protect the privacy of such records from the public at large. *See Bauer v. Kincaid,* 759 F.Supp. 575, 590–91 (W.D.Mo.1991).

The FERPA conditions federal educational funding on maintaining the privacy of "education records other than directory information." 20 U.S.C.A. § 1232g(b)(2). Education records consist of "those records, files, documents, and other materials which (1) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." *Id.* § 1232g(a)(4)(A). Education records do not include "the records and documents of [a] law enforcement unit," if the law enforcement unit meets four conditions. The unit may not have access to education records, it must maintain its records separate from all education records, it must compile the records solely for law enforcement purposes, and it may not make the records "available to persons other than law enforcement officials of the same jurisdiction." *Id.* § 1232g(a)(4)(B)(ii). The effect of the fourth condition is that "law enforcement records" become "education records" if the campus law enforcement unit makes them directly available to the public.[2] Disclosing the records of cam-

---

with the consent of the student or pursuant to a court order, neither of which conditions is particularly likely to occur. 20 U.S.C.A. § 1232(g)(b)(2).

pus police to anyone other than local law enforcement authorities violates the FERPA's privacy provisions and constitutes a ground for withdrawing federal assistance.[3]

The FERPA authorizes the Secretary to terminate all federal funding of an institution if "there has been a failure to comply with the provisions of this section, and ... compliance cannot be secured by voluntary means." 20 U.S.C. § 1232g(f). The DoE's Family Policy Compliance Office (Compliance Office) oversees enforcement of the FERPA. 34 C.F.R. § 99.60(b) (1991). The Compliance Office does not take formal action under the FERPA on its own initiative. An individual must instigate a compliance action by filing a complaint against an institution. After investigating the complaint, the Compliance Office issues a written finding and, if it finds a violation, a "statement of the specific steps that the agency or institution must take to comply." 34 C.F.R. § 99.66(c)(2). If the institution fails to comply, the Secretary may issue an order to cease the violation, or he may issue a notice of intent to terminate funding. Since 1974, the Secretary has found 150 violations through the formal complaint process. In every case, with the extraordinary leverage of withdrawing all federal funding, the DoE has obtained voluntary compliance before rendering a formal ruling. (Defendants' Memorandum at 18.)[4]

The formal complaint process is not the DoE's sole method of obtaining compliance with the FERPA. The Compliance Office has a policy of providing guidance on FERPA's provisions when it believes that an agency or institution may have violated the statute. (Defendants' Memorandum at 15.)

The Compliance Office provides such guidance on its own initiative through what it characterizes as "technical assistance" letters, which explain the FERPA and its potential application to the agency or institution. (See Defendants' Ex. C.) The technical assistance letters do not bind the Secretary and do not constitute final agency rulings. (Defendants' Memorandum at 15.)

### 2. FERPA's Effect on the Student Press

In February 1991, plaintiff Student Press Law Center (SPLC) published the results of a survey indicating that 24 universities routinely disclosed personally identifiable information regarding students in campus crime reports. (Goodman Aff. at 3.) Each of the universities was a recipient of federal funds, making the practice of disclosing personally identifiable information a potential violation of the FERPA. The DoE's Compliance Office wrote "technical assistance" letters to 14 of the universities, citing the SPLC report.[5] (Defendants' Ex. C, Schrotberger Aff. Ex. B.) The letters explained the FERPA's application to law enforcement records and indicated that continued disclosure of personally identifiable information regarding students in campus crime reports might result in losing federal funding. The letters suggested that the universities turn to state legislators if complying with the FERPA would place them in violation of state freedom of information laws. (Defendants' Ex. C.)

As a result of the Compliance Office's letters, five universities ceased providing public access to campus crime reports containing personally identifiable information regarding students.[6] (Goodman Aff. at 4–6; Defendants' Ex. D.) The President of

---

3. This result holds even if the law enforcement unit maintains its records entirely separate from students' financial, medical, or educational records.

4. Defendants cite the Declaration of LeRoy S. Rooker, Director, Office of Family Policy Compliance, as the source of this information. The Court could not locate that declaration among defendants' exhibits.

5. One of the universities was already the subject of agency action regarding the FERPA. It is not

clear what action, if any, the Compliance Office took with respect to the other nine institutions that the SPLC survey cited.

6. The five universities that changed their policies are the University of Maryland, Arizona State University, the University of Kentucky, the University of New Mexico at Albuquerque, and Colorado State University. (Goodman Aff. at 4–6.) It is not clear whether the remaining universities continue to disclose the names of students involved in campus crimes.

Arizona State University (ASU) confirmed that the DoE's technical assistance letter prompted ASU to adopt a policy of deleting student names from campus crime reports before making the reports public. (Coor Aff. at 2.) The four other universities adopted similar policies in response to the technical assistance letters.[7] (Goodman Aff. at 4–6.)

Plaintiff Lyn Schrotberger is a student at Colorado State University (CSU) and editor-in-chief of a campus daily newspaper. She attests that the CSU police department (CSUPD) routinely provided its campus crime reports to student reporters prior to February 199[1]. (Schrotberger Aff. at 3.) After receiving a technical assistance letter from the DoE's Compliance Office, the CSUPD stopped providing public access to its campus crime reports. (Schrotberger Aff. at 3 & Exs. D, E.) Schrotberger states that she must now seek the names of arrested students from the Larimer County Detention Center, which keeps a log of all the arrests in the county and does not indicate which arrestees are CSU students.[8]

Plaintiffs Sam Cristy and James C. Brewer are students at the University of Tennessee (UT) in Knoxville and are involved in student journalism.[9] The UT Police Department (UTPD) has a longstanding policy against disclosing personally identifiable information regarding students in its records of reported campus crimes. (Cristy Aff. at 4; Brewer Aff. at 2). The names of students arrested on campus are available through the Knoxville Police Department (KPD) which maintains a log of officers' reports for the entire city. (Cristy Aff. at 6.) The log includes the names and addresses of arrestees and the arresting

department. Both the UTPD and the KPD make arrests on UT's campus. To identify arrests on campus involving students, an interested member of the public must cross-check the log with the voluminous student directory for names of UT students and for arrests by the UTPD.[10] (Cristy Aff. at 6; Yovella Dec. at 1.)

Cristy, Brewer, and other students at UT asked UT's Chancellor to change its policy regarding campus crime logs. (Cristy Aff. at 4; Brewer Aff. at 3.) The Chancellor declined the request, citing the FERPA and the DoE's interpretation of its provisions. The Chancellor stated that

[T]he University seeks to protect the student privacy rights created by FERPA and to ensure the University's continued eligibility for federal funds. Our practice, however, does not inhibit disclosure of the fact that a crime has occurred on campus, whether that crime is rape, murder, or any other offense. As you well know, the University routinely releases information which enables the [campus paper] to publish a daily Crime Log summarizing all crimes reported to the University Police.

(Brewer Aff.Ex. B.)

The parties dispute the net burden that the FERPA imposes on the student press. Defendants stress that the information plaintiffs seek is available from local law enforcement authorities. Plaintiffs maintain that the statute effectively prevents them from obtaining the information they seek by preventing them from learning the names of students involved in campus crime. Without the name of an arrestee, they maintain, searching the local law enforcement records is cumbersome and inef-

---

7. SPLC's newsletter reported the inadvertent effect its survey had on the universities' policies. The newsletter also noted that the DoE has never terminated a university's funding for violating the FERPA. (Defendants' Ex. D.)

8. The parties have provided conflicting evidence regarding the availability of arrest information from the Larimer County Detention Center. Schrotberger alleges that information is unavail-

able as a practical matter without already having the names of specific arrestees.

9. Cristy is editor-in-chief of the campus newspaper, the *Daily Beacon*. Brewer is president of UT's student chapter of the Society of Professional Journalists.

10. Presumably, an interested party also must cross-check the KPD's log with the student di-

fective.[11] Defendants unpersuasively characterize the added burden on plaintiffs as trivial.

## Discussion

### 1. Justiciability of Plaintiffs' Claim

Defendants raise three threshold issues: mootness, standing, and ripeness. Each of these issues goes to the existence of a case or controversy as required by Article III of the Constitution. *See Warth v. Seldin,* 422 U.S. 490, 500 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975).

■ The Court dispenses with defendants' mootness argument briefly. Defendants suggest that this action has become moot because the House of Representatives and the Senate both have approved legislation altering the FERPA to exclude all law enforcement records. "All that now remains is for the final measure to be reported out of conference committee, approved by both houses, and signed by the President." (Defendants' Supp. Memorandum at 1.) Defendants' argument is patently wrong. Until the proposed measure actually becomes law, this action remains a live case or controversy.[12]

■ Defendants also assert that plaintiffs lack standing to challenge the FERPA. "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). To satisfy the

constitutional minimum of standing, a plaintiff must demonstrate: "[t]hat he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982) (citations omitted).

Plaintiffs' alleged injury is their inability to obtain the information they seek from their respective universities. Defendants contend that plaintiffs have suffered no actual injury because the information is available from local law enforcement agencies. Plaintiffs deny that the information is available as a practical matter, but the parties' dispute on that point is irrelevant. Plaintiffs have established that cross-checking the local law enforcement records increases their work and delays their receipt of information. Defendants suggest that the actual burden on plaintiffs is minimal. Nevertheless, the obviously increased work and delay constitute an "injury in fact" sufficient to satisfy the first requirement for standing.

Plaintiffs also have demonstrated that the injury is "fairly traceable" to the FERPA. Although the FERPA does not prohibit releasing any information, it imposes a severe penalty on universities that disclose personally identifiable information in law enforcement records. As plaintiffs' exhibits demonstrate, university officials consistently (and quite understandably) elect to avoid the statute's penalty. The officials specifically cite the FERPA as the reason for withholding information regarding students in campus crime reports. The

rectory to identify off-campus arrests involving students.

**11.** Cristy also notes that the FERPA interferes with the campus paper's ability to evaluate the performance of the UTPD. He cites the example of a rape that occurred on UT's campus. The UTPD is required to report all violent crimes to the KPD immediately. The paper received information that the campus police waited three hours before calling the KPD.

Cristy alleges that the paper was unable to verify the alleged delay without comparing the UTPD's full incident records with the KPD's records. (Cristy Aff. at 6–7.)

**12.** The defendant Secretary proposed the amendment. The record sheds no light on the Secretary's awareness of the vigorous enforcement of the provision at issue through the device of "technical assistance" letters by others within his Department.

officials' statements demonstrate that the universities would release the information but for the risk of losing federal funds. (Coor Aff. at 2; Cristy Aff.Ex. B; Goodman Aff. at 4–6.) Therefore, plaintiffs' injury is traceable to the FERPA's provisions.[13] The same reasoning leads to the conclusion that a favorable decision barring enforcement of the subject provision of the FERPA is likely to redress plaintiffs' injury. Therefore plaintiffs have standing to challenge the FERPA's provisions regarding law enforcement records.

■ Defendants pose a third challenge to the justiciability of plaintiffs' claim on the basis of ripeness. To determine whether a case is ripe for review, the Court must consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). This test serves to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from premature judicial interference." *Id.* at 148, 87 S.Ct. at 1515. To determine the fitness of an issue for review, the Court must weigh "the petitioner's interest in prompt consideration of the allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 492 (D.C.Cir.1988); *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985). "The clearest instance of an issue unfit for judicial decision is one that turns wholly on an open question of fact rather than law. But the presence of a 'purely legal question' is not enough, of itself, to render a case ripe for review."

*Office of Communication of United Church of Christ v. FCC*, 826 F.2d 101 (D.C.Cir.1987) (citations omitted). The Court determines the fitness of an agency action for review independent of whether the agency "label[s]" the decision as interpretive or final. *Id.* at 105.

Plaintiffs' claim presents a ripe issue although the DoE has not yet found it necessary to make a formal ruling as to any of the universities involved. First, plaintiffs present a facial challenge to the statute. Such a claim raises primarily legal issues. Second, the agency has had a sufficient opportunity to develop its policy and to apply it to concrete factual circumstances. Finally, the DoE may never render a "formal" ruling under the FERPA, because the agency always obtains voluntary compliance. Even without a formal complaint, the DoE regularly achieves compliance through the manifestly coercive technique that it euphemistically labels as technical assistance letters. In practice if not in name, the letters represent the agency's fully-developed and final statement on FERPA's application to campus law enforcement records. Ruling on plaintiffs' claim does not risk interfering with an unrefined policy. Therefore, plaintiffs' interest in resolving their claim outweighs the DoE's need to crystallize its policy further, and plaintiffs' claim is ripe for review.

### 2. Plaintiffs' Motion for a Preliminary Injunction

To rule on a request for preliminary injunctive relief, "the district court should consider (1) the plaintiff's likelihood of prevailing on the merits, (2) the threat of irreparable injury to the plaintiff in the absence of injunctive relief, (3) the possibility of substantial harm to other interested parties from the injunctive relief, and (4)

---

**13.** Defendants note that FERPA does not authorize violating state freedom of information laws. "The most that could be said is that the FERPA makes disclosure financially unattractive, but not less legally imperative." (Defendants' Memorandum at 26.) Thus, defendants argue, plaintiffs' injury flows from the universities' violation of state sunshine laws rather than their compliance with the FERPA. Defendants thus ignore the obvious fact that the FERPA is the universi-

ties' primary reason for violating the state sunshine laws. Defendants' suggestion that the universities may choose to comply with state law and forego federal funding is unrealistic and disingenuous. In its technical assistance letters, the DoE urges universities to lobby for state laws consistent with the FERPA, while brandishing the statute's harsh penalty to obtain compliance.

the interests of the public." *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 151 (D.C.Cir.1985) (citing *WMATC v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm.,* 259 F.2d 921, 925 (D.C.Cir.1958)).

Plaintiffs have not demonstrated a significant likelihood of success on the merits of their equal protection claim. Plaintiffs contend that the FERPA adversely affects the First Amendment rights of the student press by restricting access to information that is uniquely interesting to the campus community. There is no precedent to support plaintiffs' claim, and the student press suffers no restriction that does not apply to the public as a whole. Therefore, plaintiffs have not shown that the FERPA implicates equal protection concerns.

■ Plaintiffs have demonstrated a greater likelihood of success on the merits of their First Amendment claim. The Supreme Court has noted in a variety of contexts that the First Amendment "protects the right to receive information and ideas." *Board of Educ. v. Pico,* 457 U.S. 853, 867, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982); *see Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367 (1969); *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed.

430 (1945). The right to receive information and ideas "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." [14] *Pico,* 457 U.S. at 867, 102 S.Ct. at 2808. Therefore, plaintiffs' claim that the FERPA interferes with their ability to gather information regarding campus crimes implicates the First Amendment.

The right to receive information is not as broad as the right of free speech from which it stems.[15] "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). The government does not have an affirmative obligation to increase the scope of information available to the public.[16] *See Pico,* 457 U.S. at 872, 102 S.Ct. at 2810–11. Even in cases involving an otherwise willing or available source of information, the Supreme Court has upheld restrictions on the public's right of access.[17] *See, e.g., Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (upholding restriction against interviewing prison inmates).

Plaintiffs have a substantial likelihood of success on the merits of their claim despite the somewhat limited protection that the First Amendment provides the right to receive information. In cases approving a rule or law restricting public access to information, the Supreme Court has noted a

---

**14.** In part, the right to receive ideas derives from the "sender's First Amendment right to send them," and in part it exists as a "predicate to the recipient's meaningful exercise of his own rights of free speech, press, and political freedom." *Pico,* 457 U.S. at 867, 102 S.Ct. at 2808.

**15.** The Supreme Court has recognized a potential First Amendment violation based on the right to receive information in only one case. In *Board of Educ. v. Pico,* the Court held that a local school board may not remove books from the library of a public school for the primary purpose of restricting students' access to the ideas within the books. *Pico,* 457 U.S. at 872, 102 S.Ct. at 2810–11. The Court stressed that its decision concerned "the suppression of ideas," and cautioned that "nothing in our ruling today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools." *Id.* The Court's cautionary language indicates that it did not intend to impose an affirmative duty on the Govern-

ment to increase the scope of information and ideas available to the public.

**16.** Common sense dictates that the public does not enjoy a free-standing First Amendment right of access to all information that the government may possess. If such a right existed, the Freedom of Information Act, 5 U.S.C.A. § 552 (1988 & Supp.1991), the Privacy Act, 5 U.S.C.A. § 552a, and similar state laws would be redundant. *See Norwood v. Slammons,* No. 91–5049, slip op. at 12–13 (W.D.Ark.1991).

**17.** The press does not enjoy "a special right of access to information not available to the public generally." *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 684–85, 92 S.Ct. 2646, 2658–59, 33 L.Ed.2d 626 (1972). Therefore, the Court couches its analysis of plaintiffs' claim in terms of their right to receive information as members of the public rather than as members of the student press.

governmental interest justifying the restriction. *See, e.g., Pell,* 417 U.S. at 830–833, 94 S.Ct. at 2808–2810 (prison security); *Kleindienst,* 408 U.S. at 770, 92 S.Ct. at 2585–86 (plenary authority to exclude aliens). Defendants have not offered a single justification for preventing universities from disclosing the names of students involved in criminal activity.[18] The Government apparently takes the position that the FERPA's imposition on the right to receive information is minimal, and therefore requires no justification. That position is untenable even in an area of limited constitutional protection. In light of the universities' willingness (absent coercion to the contrary) to release campus crime reports in full, the Government must assert some interest that outweighs the public's First Amendment right to receive the information.

The remaining considerations for a preliminary injunction also weigh in plaintiffs' favor. The Court presumes that irreparable harm will flow to plaintiffs from a continuing constitutional violation. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). The Court recognizes that releasing the names of students arrested on campus poses potential harm to their reputations. As defendants noted at oral argument, any information released pursuant to a preliminary injunction cannot be reclaimed. There is no legitimate privacy interest in arrest records, *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and therefore the potential harm to third-parties is not legally cognizable. Finally, the Court's decision is consistent with the interests of the public in greater access to information. That interest is at its highest in matters that bear on personal safety and the prevention of crime.

The Court accordingly grants plaintiffs' motion for a preliminary injunction. The

DoE and the Secretary are enjoined from preventing universities or other educational institutions from releasing to the public personally identifiable information regarding students in law enforcement records by withdrawing or threatening to withdraw federal funding. The DoE's Compliance Office shall refrain from issuing technical assistance letters that take the position that the Department may withdraw federal funding from an institution for releasing such information. Of course, the Court's decision does not affect defendants' authority to enforce any other provisions of the FERPA.

---

18. In *Kleindienst v. Mandel,* the Supreme Court reviewed the State Department's decision to deny a visa to enter the United States to a known communist activist who had violated the terms of a previous visa. *Kleindienst,* 408 U.S. at 756, 92 S.Ct. at 2578. The Court upheld the denial in the face of a First Amendment challenge that it limited the flow of ideas to interested persons in the United States. The Court stressed that the State Department asserted a "facially legitimate and bona fide reason" for denying the visa. *Id.* at 771, 92 S.Ct. at 2586. The Court further commented: "What First Amendment or other grounds may be available for attacking exercise of discretion for which no justification is advanced is a question we neither address or decide in this case." *Id.*