**LAKE PILOTS ASSOCIATION, INC., Plaintiff,**

v.

**UNITED STATES COAST GUARD, et al. Defendants.**

**No. CIV.A. 01–1721(RBW).**

United States District Court, District of Columbia.

April 4, 2003.

Katherine Street Nucci, Thompson Coburn, LLP, Washington, DC, for Plaintiff.

Sherri Evans Harris, U.S. Attorney's Office, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

WALTON, District Judge.

This lawsuit was filed by a group of pilots who provide navigational services on the Great Lakes. Currently before the Court are the parties' cross-motions for summary judgment.[1] Also before the

---

1. Defendant actually filed a motion to dismiss pursuant to Federal Rule of Civil Procedure

Court are the parties' pleadings regarding the defendant's Notice to the Court and Suggestion of Mootness. The Court rejects the defendant's[2] argument that all of the issues raised by plaintiff's complaint are moot and concludes that both plaintiff's and defendant's motions for summary judgment must be granted in part and denied in part.

## I. *Factual Background*

### A. Events Underlying the Parties' Dispute

Foreign ships engaged in foreign trade that travel on the Great Lakes must hire an experienced American or Canadian pilot to provide navigational services on such vessels as required by the Great Lakes Pilotage Act of 1960, codified at 46 U.S.C. §§ 9301–9309 (2000) ("GLPA"). Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and/or For Summary Judgment ("Def.'s Mem.") at 1. There are three voluntary associations of United States registered pilots that provide pilotage services on the Great Lakes. *Id.* at 2. Plaintiff, the Lake Pilots Association ("Lake Pilots" or "the Association"), one of the three associations, is "an organization of thirteen licensed pilots who provide navigational services for vessels travelling [sic] the Great Lakes."[3]

Plaintiff's Motion for Summary Judgment, Supporting Memorandum of Points and Authorities ("Pl.'s Mem.") at 2. The Association provides services on the waters that comprise District Two, "which covers Lake Erie and Detroit-area waters up to Port Huron, Michigan[,]" and constitutes Areas 4 and 5.[4] *Id.;* 66 Fed.Reg. at 36488.

The GLPA authorizes the Secretary of Transportation to license pilots and, most importantly for purposes of this litigation, determine the rates that pilots may charge for their services. Pl.'s Mem. at 2 (citing 46 U.S.C. § 9301). The Secretary has delegated this rate making authority to the Commandant of the Coast Guard ("Commandant") pursuant to 46 U.S.C. § 2104, who has in turn delegated his authority to the Director of the Great Lakes Pilotage Office ("Director" or "GLPO") in implementing regulations found at 46 C.F.R. Parts 401–404. Def.'s Mem. at 2.

There are two types of waters in the Great Lakes on which pilots must provide navigational services to ships. In "designated waters," which are designated by the President, the pilot must actually direct the movement of the ship. Def.'s Mem. at 2. In all other waters, known as "undesignated waters," the pilot must merely be on board and available to direct

---

12(b)(6), or in the alternative, for summary judgment. Because the Court, in the context of this Administrative Procedure Act ("APA") review, has considered the administrative record that was before the agency at the time it made its decision, it has construed defendant's motion as one for summary judgment only. *See* Fed.R.Civ.P. 12(b) ("If on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to a state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment …").

2. In its complaint, plaintiff named the United States Coast Guard and Norman Mineta, Sec-

retary of Transportation, as defendants. In their pleadings, the defendants refer to themselves in the singular and list only the United States Coast Guard as a defendant. Because the Coast Guard was the entity responsible for establishing the rates at issue in this case, and for simplicity and uniformity, the Court refers to the defendants in the singular throughout this opinion.

3. The Association is a corporation and its pilots are the Association's shareholders. Pl.'s Mem. at 2.

4. Specifically, Area 4 consists of Lake Erie and Area 5 encompasses South East Shoal to Port Huron, Michigan. 66 Fed.Reg. at 36488.

the vessel's movement subject to the discretion of the vessel's master. *Id.* The rates for pilotage services on the two types of waters differ. *Id.* at 2–3. The Act itself does not set forth a specific formula for calculating pilotage rates. *Id.* Rather, the methodology for calculating pilotage rates is set forth in a Final Rule issued by the Commandant in 1996. *Id.* (citing 61 Fed.Reg. 21,081). The rates and charges for pilotage services are reviewed annually by the Director. *Id.* at 3. In determining pilotage rates, the Director is guided by the statute's direction to balance the public's interests, which includes lower shipping costs, with the cost of providing pilotage services.[5] *Id.* At the center of the present controversy are the basic rates for pilotage services in District Two. Pl.'s Mem. at 3.

Coast Guard regulations require that the GPLO conduct an annual review of Great Lake pilotage rates and that new rates be established once every five years. *Id.* (citing 46 C.F.R. § 404(b)). There are six steps, which are set forth in 46 C.F.R. § 404, Appendix A, that the Director must take in determining the relevant pilotage rates.[6] First, the director collects financial information from the three pilot associations to "project ... the total authorized operating expenses for each association." Def.'s Mem. at 3. Second, the director projects the target pilot compensation, which involves a determination of the targeted rate of pilot compensation and the number of pilots needed in each district to meet the needs of the shipping industry. *Id.* Third, he "projects revenue

using the current pilotage rates." *Id.* Fourth, he determines each pilot association's investment base and determines what an appropriate return on this investment base would be for each association. *Id.* Fifth, he subtracts projected expenses, which includes pilot compensation, from each association's projected revenue and determines each association's projected net income. *Id.* Next, he compares the projected net income with the targeted return on the investment base for each association. *Id.* Finally, if there is a significant difference between the projected rate of return and the targeted rate of return on the investment base, the Director will adjusts the rates for pilotage services appropriately. *Id.*; *see also* 46 C.F.R. Pt. 404, App. A. After this process is completed, the Director initiates a rulemaking by publishing a Notice of Proposed Rulemaking (NPRM) and invites comments from the public, including from pilot and shipping interests groups. *Id.* at 3. After public comments have been reviewed and necessary adjustments, if any, are made, a Final Rule is published establishing the new rates. *Id.* However, if there is not a significant difference between the projected and targeted rate of return on the investment base, the Director leaves the pilotage rates unchanged. *Id.* at 3–4.

Prior to the adoption of the Final Rule at issue in this lawsuit, pilotage rates for the Great Lakes were last adjusted through a rulemaking in 1997. *Id.* at 4. As part of the 1997 Final Rule, the Director announced at that time "that master salary

---

5. Plaintiff states that the formula is "designed to balance the Association's projected revenues (expected vessel calls requiring pilotage service multiplied by the rates for those services) and expenses (including the pilots' compensation and a return on the capital they have invested in their association.)." Pl.'s Mem. at 3.

6. This methodology was published in a Final Rule on May 9, 1996. Def.'s Mem. at 4. The 1997 Final Rule was the first to establish rates utilizing this methodology. Pl.'s Mem. at 4 (citing 62 Fed.Reg. 5917 (Feb. 10, 1997)).

was defined as '1.5 times mate salary, plus mate benefits.'" *Id.* (citing 62 Fed.Reg. 5917, 5920 (February 10, 1997)). No changes were made to the rates in 1998. *Id.* However, as a result of the 1999 review, the Coast Guard proposed adjusting rates for pilotage services by publishing a NPRM on April 14, 2000. *Id.;* 65 Fed. Reg. 20,110 (April 14, 2000). This 2000 NPRM proposed a reduction in pilotage rates in District Two for both designated and undesignated waters. *Id.* After receipt of comments from the public, on September 13, 2000, a Supplemental Notice of Proposed Rulemaking ("SNPRM"), which also recommended a reduction in pilotage rates in District Two on both designated and undesignated waters, and also announced that a public meeting to address the proposed rate change would be held, was published.[7] *Id.;* 65 Fed.Reg. 55206 (September 13, 2000).

The Final Rule at issue in this case was published in the Federal Register on July 12, 2001, after the public meeting was held and then several changes were made to the proposed rates. *Id.* at 4; 66 Fed.Reg. 36,484 (July 12, 2001). As a result of the 2001 Final Rule, pilotage rates for designated waters in District Two decreased by five percent while the rates for undesignated waters were increased by three percent. 66 Fed.Reg. at 36,488; Defendant's Mot., Statement of Material Facts to Which There Is No Genuine Issue ("Def.'s Stmt.") ¶ 6.

On August 9, 2001, plaintiff filed its complaint and a motion for a temporary restraining order to enjoin the United States Coast Guard ("USCG") from implementing the Final Rule. *Id.* Plaintiff's motion for a temporary restraining order was denied on Friday, August 10, 2001, following a hearing that was conducted by the judge who previously presided over this case. The Final Rule setting the new pilotage rates became effective on August 13, 2001. *Id.* The parties then each filed motions for summary judgment on April 5, 2002.

## B. Facts Related to the Issue of Mootness

Before the Court can address the merits of the parties' arguments, it must delineate the history of the proceedings up to this point. Indeed, the most substantial number of pleadings that have been filed have addressed whether the issues raised in plaintiff's complaint have been rendered moot by the subsequent actions of the defendant. Because the history of this litigation spans a period of over a year and a half, the Court will detail the substance of the numerous pleadings the parties have filed regarding the mootness question.

In June 2002, while the parties' cross-motions for summary judgment were pending, and in lieu of filing a reply to the opposition to its motion for summary judgment, the defendant partially withdrew its 2001 pilotage rates for designated waters in District Two, filed a notice of the partial withdrawal with the Court, and requested that this action be dismissed as moot. Defendant's Notice to Court and Suggestion of Mootness filed June 21, 2002, at 1. Thereafter, plaintiff filed its Response to Defendant's Suggestion of Mootness, in which it argued that as a result of the defendant's violations, *"the Association has lost hundreds of thousands of dollars over the past year in revenues that it should have been legally entitled to collect from its commercial customers"* and that

---

7. The NPRM stated that a meeting regarding the new rates would not be held. 65 Fed.Reg. at 20111. However, in the SNPRM, the Coast Guard announced that a public meeting would be held on October 12, 2000, during which the specific issues raised in the SNPRM would be addressed. 65 Fed.Reg. at 55207.

it will continue to suffer such losses until the new rates are established, which could take twelve to twenty-four months to complete. *Id.* at 2 (emphasis in original). In addition, plaintiff argued that one of the primary reasons it filed this action was to challenge the defendant's differential treatment of District Two, a fact that it contends would not be changed by the defendant's return to the 1997 rates, because the change would only affect District Two and none of the other districts. *Id.* at 5. Although plaintiff acknowledged that it sought to have the 1997 rates reinstated,[8] this was not, plaintiff claims, its ultimate goal. Rather, it only sought reinstatement of the 1997 rates pending the outcome of this litigation, with the eventual result of having the Final Rule remanded to the defendant by the Court with specific instructions regarding how to remedy the defects in the 2001 rates. *Id.* at 6–7. In response, the defendant argued that continuing with this lawsuit would be a waste of judicial resources because the Coast Guard intended to conduct a new rulemaking for Great Lakes Pilotage Rates. Defendant's Reply to Plaintiff's Response to Defendant's Suggestion of Mootness at 2. Defendant argued that the plaintiff sought greater relief than is pled in its complaint, including an order requiring the Coast Guard to recalculate the pilotage rates using the specific data and interpretations of the Coast Guard's guidelines provided by the plaintiff. *Id.* at 2–3. This relief, defendant contends, is beyond the Court's authority because under the Administrative Procedure Act ("APA"), the sole remedy this Court could properly provide to plaintiff, if it concluded that the defendant had violated the APA, would be to set aside the 2001 Great Lakes Pilotage Rates and remand the matter to the Coast Guard for a new rulemaking, because this Court cannot substitute its judgment for that of the agency. *Id.*

On July 19, 2002, the defendant issued a temporary final rule, which "amends the rates charged for Great Lakes Pilotage on the Designated Waters of Area 5 in District Two and restores them to those effective before August 13, 2001." 67 Fed.Reg. 47,464 (July 19, 2002). The Coast Guard stated that this temporary rule was issued because it "learned during the course of the litigation that it had inadvertently accounted for hours of delay and detention in District Two differently from how it was done in Districts One and Three." *Id.* In addition, the Coast Guard noted in the temporary final rule that it is "currently working on an updated rulemaking that will, among other things, correct this error." *Id.* Subsequently, on July 23, 2002, defendant filed its Notice to the Court of Temporary Final Rule ("Notice"). According to the Notice, the Temporary Final Rule "is effective from July 19, 2002 to July 21, 2003, and is not retroactive." On October 18, 2002, defendant filed a Corrected Notice of Further Action ("Def.'s Corrected Notice"), in which it advised the Court that the Coast Guard had appointed Rear Admiral J. Timothy Riker, of the Coast Guard, to conduct a review of the bridge hour standards for United States pilots operating on the Great Lakes. Def.'s Corrected Notice at 2. This review will address the issues related to whether bridge hour standards should include hours associated with detention, delay, cancellation, rest and travel. *Id.* Plaintiff's

---

**8.** In plaintiff's motion for summary judgment, plaintiff explicitly requested: "an order [from this Court] striking down the most recently enacted rates, immediately reinstating the rates previously in effect, and requiring the GLPO to recalculate the rates in a manner consistent with federal law." Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") at 1.

Reply to Defendant's Notice of Further Action ("Pl.'s Reply") stated that none of the "activities" mentioned in defendant's notice are "relevant to this proceeding" and that the GLPO's current actions do not remedy its past violations. Pl.'s Reply at 1–2.

The Court heard oral arguments regarding the mootness issue on November 21, 2002. At that time, the defendant stated it would publish an initial NPRM on December 6, 2002. As a result, the Court stated it would delay ruling on the merits of this matter until this new rulemaking notice was issued, as this new rulemaking would, according to counsel for the defendant, address the issues currently before the Court.[9] On December 12, 2002, the defendant submitted a pleading to the Court in which it stated that the NPRM had not been published but was expected to be published "in the next month" and that defendant would file a progress report with the Court on or before December 31, 2002. Defendant's Notice to Court Regarding Impending Notice of Proposed Rulemaking at 1. Plaintiff responded to this pleading arguing that the defendant continued to attempt to delay the Court's resolution of this matter on the merits and that even if defendant is planning to issue a new rule, new rates resulting from the rule would not be finalized for several months, or possibly longer. Plaintiff's Reply to Defendant's Notice to Court Regarding Impending Notice of Proposed Rulemaking at 3. In addition, plaintiff argued that the defendant is not "correcting the mistakes it made in the Final Rule . . . [but] is simply proceeding with its nor-

mal rate review and adjustment process." *Id.*

As further support for its mootness arguments, the defendant filed with the Court a Second Notice to the Court Regarding Impending Notice of Proposed Rulemaking on December 30, 2002 ("Defs.' Notice"). In this notice, the defendant stated that the Coast Guard "had now executed the NPRM entitled 'Rates for Pilotage on the Great Lakes,' and has forwarded the same for necessary review and approval by the Office of the Assistant Secretary for Transportation Policy . . . prior to its submission for final publication in the federal register." Defs.' Notice at 1. Thereafter, defendant filed another pleading on January 23, 2003, entitled "Defendant's Notice to Court and Further Suggestion of Mootness ("Defs.' Further Notice") in which it informed the Court that as of the date of this notice, a NPRM had been published regarding the pilotage rates on the Great Lakes." Defs.' Further Notice at 1. Defendant maintains that this act forecloses review by this Court because the "NPRM proposes to amend the pilotage rates for all Districts on the Great Lakes, and further advises of the Defendant USCG's intention to issue an interim rule setting forth pilotage rates in time for the 2003 shipping season." *Id.* at 2. In response, plaintiff filed a Reply to Defendant's Further Suggestion of Mootness wherein it reiterates that the NPRM does not render this action moot because it fails to "completely address[ ] . . . the four key issues identified in this lawsuit." *Id.* at 2. Further, the plaintiff argued that the focus of this litigation concerns the mistakes the

9. The Court had anticipated issuing its ruling on the merits on December 20, 2002. However, in the midst of preparing its opinion, the Court learned that the administrative record had not been filed by the defendant with the Court. Thereafter, the Court issued an order to the defendant directing it to file the admin-

istrative record with the Clerk's office, which the defendant did on December 31, 2002. The issuance of this opinion was further delayed, however, because the Court had to fully review the substantial administrative record prior to issuing its ruling.

defendant made in the Final Rule that became effective in August 2001 and the need for a ruling on this rule is not mooted by the issuance of the NPRM because "important legal rights are associated with a judicial finding that the Final Rule was improper[,]" which "include the Pilots' right to claim attorneys' fees under the Equal Access to Justice Act." *Id.* at 5 & n. 6. On February 20, 2003, the plaintiff informed the Court in its Notice to the Court Concerning Defendant's Failure to Issue Interim Rule, Request for Oral Hearing, that the GLPO has chosen to "rescind its decision to issue an interim rate increase that would have taken effect before the end-of-March start of the 2003 shipping season." *Id.* at 1. This notice by the plaintiff was prompted by defendant's issuance of its Notice of Extension of Comment Period and Notice of Intent, wherein the Coast Guard states that it is "extending the comment period on the [NPRM] on rates for pilotage on the Great Lakes published in the Federal Register January 23, 2003, for 45 days ... [thus] extend[ing] the comment period to April 24, 2003." 68 Fed.Reg. 7489 (Feb. 14, 2003).[10]

## II. *Analysis*

### A. *Mootness*

 The Court must first decide whether the defendant's post-complaint actions in this matter have rendered the issues raised by plaintiff's complaint moot. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (citation omitted). As "a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot.'" *Id.* (citation omitted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Services,* 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case."); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (citation omitted) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot[,] ... [because a] controversy ... remain[s] to be settled in such circumstances, ... *e.g.,* a dispute over the legality of the challenged practices."). In cases involving voluntary cessation of challenged activity, "a court may conclude that voluntary cessation has rendered a case moot if the party urging mootness demonstrates that (1) "'there is no reasonable expectation that the alleged violation will recur,' and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *National Black Police Assoc. v. District of Columbia,* 108 F.3d 346, 349 (D.C.Cir.1997) (quoting *County of Los Angeles,* 440 U.S. at 631, 99 S.Ct. 1379) (other citations omitted). Defendants "claiming that [their] voluntary compliance moots a case bear[ ] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.,* 528 U.S. at 190, 120 S.Ct. 693; *W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. 894. The Court need not dwell on this issue long because it is clear that the defendant has not satisfied the heavy burden of demonstrating that this action is moot.

---

**10.** The Coast Guard's notice also states that it will delay publication of an Interim Rule, which was previously planned for release on February 12, 2003, to approximately April 30, 2003. 68 Fed.Reg. at 7489.

■ The defendant's actions have not mooted this action for two reasons. First, the defendant has not demonstrated to the Court that "there is no reasonable expectation that the alleged violation will recur,'" *National Black Police Assoc.*, 108 F.3d at 349, because it is clear from the temporary final rule that was published on July 19, 2002, that the rule is by no means final. *See* 67 Fed.Reg. at 47,464 ("The Coast Guard ... learn[ed] during the course of litigation that it had inadvertently accounted for hours of delay and detention differently from how it was done in Districts One and Three. The Coast Guard is currently working on an updated rulemaking that will, among other things, correct this error ... This temporary final rule will not be retroactive and future rates will not be adjusted as a result of this action."). Although defendant has conceded that they erred in disregarding detention and delay hours, they have only published a temporary rule returning the rates to those set prior to the enactment of the challenged Final Rule, and although there is currently a review of the rates being conducted, the temporary final rule "will not be retroactive and future rates will not be adjusted as a result of this action." 67 Fed.Reg. at 47,464–465. This language clearly indicates that the defendant has not committed itself to include such hours in the future Final Rule or to uniformly include detention and delay hours when calculating the number of pilots needed in all districts and therefore the temporary final rule does nothing to assure this Court that the alleged unlawful conduct will not recur. *See Friends of the Earth. Inc.*, 528 U.S. at 193–94, 120 S.Ct. 693 (holding that defendant's substantial compliance with its environmental pollutant discharge permit and the closure of its facility did not moot plaintiff citizens' enforcement action brought pursuant to the Clean Water Act. "The facility closure, like [the defendant's] earlier achievement of substantial compliance with its permit requirements, might moot the case, but–– we once more reiterateonly if one or the other of these events made it absolutely clear that [the defendant's] permit violations could not reasonably be expected to recur ... [and][t]he effect of both [the defendant's] compliance and the facility closure on the prospect of future violations is a disputed factual matter.") (citation omitted); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("We agree with the City that the case is not moot, since the moratorium by its terms is not permanent. Intervening events have not 'irrevocably eradicated the effects of the alleged violation.'") (quoting *County of Los Angeles*, 440 U.S. at 631, 99 S.Ct. 1379); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) (holding that city's partial repeal of language contained in ordinance did not moot the Court's consideration of the challenge. "In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated."); *Student Press Law Center v. Alexander*, 778 F.Supp. 1227, 1231 (D.D.C.1991) (holding that action challenging provision regarding disclosure of law enforcement records of the Family Educational Rights and Privacy Act ("FERPA") was not rendered moot by Congress' approval of "legislation altering the FERPA to exclude all law enforcement records.... Until the proposed measure actually becomes law, this action remains a live case or controversy."). *Cf. County of Los Angeles*, 440 U.S. at 631–32, 99 S.Ct. 1379 (holding that first condition of mootness was satisfied where there was "no reasonable expectation that petitioners [would] use an unvalidated civil service examination for the purposes contemplated

in 1972.... Those conditions were unique, are no longer present, and are unlikely to recur because, since the commencement of this litigation, petitioners have succeeded in instituting an efficient and nonrandom method of screening job applicants ...". Therefore, because there is a likelihood that the challenged conduct could recur, the Court concludes the defendant has failed to establish that its actions have now rendered the relief plaintiff is seeking moot.[11]

Second, to render this action moot, the defendant must demonstrate that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation[s]." *County of Los Angeles*, 440 U.S. at 631, 99 S.Ct. 1379 (citations omitted). In this regard, the temporary rule provides that the "measure will mitigate the effects, if any, of the Coast Guard's disparate treatment in District Two *when accounting for hours of delay and detention.*" 67 Fed.Reg. at 47465 (emphasis added). This language does not demonstrate to the Court that the effects of the alleged violation have been "irrevocably eradicated[,]" *County of Los Angeles*, 440 U.S. at 631, 99 S.Ct. 1379, because the temporary rule does not address all of the issues plaintiff raised in its complaint.

Paragraph 12 of plaintiff's complaint challenges the Coast Guard's Final Rule as arbitrary and capricious because:

> the Coast Guard has (1) disregarded the method for calculating the number of pilots needed in each district ... (2) ignored the regulations' instructions

with respect to pilot compensation ... (3) disregarded the regulations with respect to the calculation of the Association's investment base ... and (4) ignored, contrary to the regulations, the Associations' subsistence expenses ...

While plaintiff's challenge included the defendant's "refusal to count detention and delay hours" in calculating the number of pilots needed in District Two, an issue that is addressed by the defendant's temporary final rule, this was not the full extent of the relief plaintiff sought and has not, as stated by defendant, rendered "further consideration of this action ... moot," Defendant's Notice to Court and Suggestion of Mootness at 3. Therefore, even if the Court could conclude that the temporary final rule fully addressed plaintiff's concern about detention and delay hours, there are several other issues raised in plaintiff's complaint that would not be rendered moot at this point. *Cf. National Black Police Assoc.*, 108 F.3d at 350 ("[P]assage of the new legislation has completely and irrevocably eradicated the effects of the alleged violation. Plaintiffs sought only to have Initiative 41's limits declared unconstitutional and enjoined. But, as a result of the new legislation, Initiative 41's limits are no longer in force and plaintiffs do not contend that these limits continue to have any residual effect. Hence, declaratory and injunctive relief would no longer be appropriate.") (citations omitted). Defendant has not asserted that a review of its past actions will address all of the actions challenged by

---

**11.** The Court is cognizant of the fact that "the mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged law likely will be reenacted." *National Black Police Assoc.*, 108 F.3d at 349. However, in this case, the Court bases its conclusion not only on the fact

that the interim rule is temporary and, by its own terms, states that future rates will not be affected by its terms, but also on the fact that the temporary rule does not at all address, for example, the challenges plaintiff has made pertaining to how the amount of compensation pilots in District Two should receive was calculated, as well as other issues the Court will discuss hereafter, *infra* at 15–16.

plaintiff, *i.e.*, recalculation of the target rate of compensation and the Association's investment base, and inclusion of the Association's subsistence expenses. It only states that a review is being undertaken and, in the interim, the previous rates will be reinstated. This assertion falls far short of satisfying defendant's "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 190, 120 S.Ct. 693 (citation omitted).[12]

For these two reasons, the Court concludes that the temporary rule does has not "irrevocably eradicated the effects of the alleged violation[s]" that resulted from the adoption of the 2001 Final Rule. Although defendant argues that it has effectively granted plaintiff the relief it sought, this relief is incomplete and, in any event, is not final.

### B. Ripeness

The Court must next consider whether all aspects of the parties' controversy remain justiciable at this time. The Court concludes that all of the plaintiff's claims except for the claim concerning the detention and delay hours are.

■ Plaintiff argues that the defendant's exclusion of detention and delay hours from the calculation regarding the number of pilots needed in District Two, was arbitrary and capricious for three reasons. First, detention and delay hours were included in the Final Rule promulgated in 1997. Pl.'s Mem. at 11–12. Second, defendant has abandoned its prior

position and has failed to "explain or justify its decision . . ." for this departure. *Id.* at 11. Third, the defendant has included detention and delay hours in calculating the number of pilots needed for Districts One [13] and Three. *Id.* at 13. Defendant does not address plaintiff's allegation that it has treated District Two differently from the way it has treated Districts One and Three in its motion to dismiss. However, this fact is acknowledged by the defendant's subsequent temporary final rule that was published on July 19, 2002. The temporary final rule states, in part:

> On July 12, 2001, the Coast Guard published a final rule in the Federal Register [66 FR 36484] amending the ratemaking for the Great Lakes Pilotage. The new rates became effective August 13, 2001. They were challenged in court by the Lake Pilots Association representing the pilots in District Two, Lake Erie. While preparing our defense, we discovered that we had inadvertently accounted for hours of delay and detention in District Two differently from how we had in Districts One and Three. . . . We are undertaking a study to address, among other things, the issue of how we should count hours of delay and detention when computing bridge-hours in all Districts. . . .

> [The Coast Guard] is temporarily restoring the rates that were effective before August 13, 2001. . . . This measure will mitigate the effects, if any, of the Coast Guard's disparate treatment of the pilots in District Two, *when accounting for hours of delay and detention.*

---

12. The Court need not address the defendant's argument that the NPRM moots consideration of this case. As plaintiff's February 20, 2003, notice to the Court states, this NPRM has been rescinded. Defendant has not advised the Court that this information is not accurate.

13. Plaintiff notes that the number of hours reported by District One mistakenly omitted delay hours due to an error caused by its accounting program, but states that these hours represented a "very small percentage of total bridge hours . . ." Pl.'s Mem. at 13 n. 7.

67 Fed.Reg. 47,464 (July 19, 2002) (emphasis added).[14]

Defendant, in its temporary final rule, explicitly concedes that it treated plaintiff's pilots differently than the pilots in the other two districts by eliminating hours of detention and delay and has therefore reinstated the 1997 rates, a remedy that the plaintiff requested in its motion as interim relief, pending a new Final Rule. *See* Pl.'s Mot. at 22 (requesting an order from the Court granting summary judgment in plaintiff's favor and "striking down the most recently enacted rates[,] . . . immediately reinstating the rates previously in effect; and requiring the GLPO to recalculate the rates in a manner consistent with federal law."). At the time of the issuance of this opinion, the defendant has undertaken an extensive review of this situation and has extended the notice and comment period regarding the NPRM pertaining to a new Final Rule. Therefore, it is, at this point, merely speculative whether the Coast Guard will take the position that detention and delay hours should be counted differently in the three districts or categorically excluded in all districts, as it has acknowledged that it included such hours for Districts One and Three but inadvertently failed to do so for District Two. Thus, the defendant has not yet taken a definitive position to treat the districts differently or to exclude such hours in all districts as a matter of policy. The Court therefore finds that the issue regarding exclusion of delay and detention hours in District Two, although not moot, is not ripe for adjudication at this time.

■ The "basic rationale" behind the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ There are two considerations the Court must take into account in determining whether an issue is ripe for judicial review: "(1) 'the fitness of the issue[ ] for judicial decision,' and (2) 'the hardship to the parties of withholding court consideration.' " *State Farm Mutual Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir. 1986) (quoting *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. 1507).

■ In determining the fitness of the issue for a judicial determination, the Court must consider "any institutional interests that either the court or the agency may have for postponing review." *State Farm*, 802 F.2d at 479. This implicates consideration of "whether the agency's action is final and whether the issue is a purely legal one." *Id.* (citations omitted). However, even if both of these prerequisites are satisfied, the Court may still "properly deem a matter unfit for resolution if postponing review would provide for a more efficient examination and disposition of the issues." *Id.* (citations omitted); *see also Beverly Enterprises, Inc. v. Herman*, 50 F.Supp.2d 7, 13 (D.D.C.1999) (in determining the fitness of an issue for judicial determination, the court must consider whether the "disputed claims raise purely legal questions . . . whether the court or the agency would benefit from postponing review until the policy in question has sufficiently 'crystallized' by taking

**14.** Notice of this temporary final rule was filed by the defendant with the Court on July 23, 2002.

on a more definite form; and ... whether the agency's action is sufficiently final.").

In this case, it is clear that the agency's action with regards to the detention and delay hours issue is not final. The agency has admitted its error in not including these hours for District Two; it has reinstated the prior rates that were in effect prior to the adoption of the 2001 Final Rule, pending resolution of the issue; it has undertaken review of the issue; and it has extended the notice and comment period regarding this issue to afford all interested parties the opportunity to comment. In light of these actions, the Court concludes that its consideration of the delay and detention hours issue would be premature at this time. *See Beverly Enterprises, Inc.*, 50 F.Supp.2d at 14 (holding that the plaintiffs' "pre-enforcement challenge to [the Department of Labor's] regulations [was] premature. Both regulations [were] discretionary, and at this point the Court cannot discern whether the regulations will be enforced in the manner contemplated by plaintiffs or what reasons the [Department of Labor] will give to justify any enforcement.") (citations omitted). *Cf. Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. 1507 (holding that issues presented to the Court were "appropriate for judicial resolution ... where the issue tendered is a purely legal one .... and no claim [was]

made ... that further administrative proceedings [were] contemplated."). Therefore, the "issue [before the Court here] is ... unfit for review because it has not yet arisen in a sufficiently concrete setting." *State Farm*, 802 F.2d at 484. Were the Court to entertain this issue at this juncture, it "would venture away from the domain of judicial review into a realm more accurately described as judicial preview." *Id.* at 485 (citation and internal quotation marks omitted).

With regard to the second prong of the *Abbott Laboratories* test, the Court concludes that "the alleged hardship created by postponing review of this issue is insufficient to outweigh the institutional interests in postponement." *State Farm*, 802 F.2d at 485. This is not to say that plaintiff has not experienced any hardship. As explained in plaintiff's motion for summary judgment, the determination by the defendant to exclude detention and delay hours directly impacts the "number of pilots (or manpower) required to provide pilotage services in each pilotage area." Pl.'s Mem. at 10. "The practical effect" of excluding a number of hours that a pilot is required to be aboard a vessel "is that District [Two] pilots must either work significantly more hours or accept significantly less compensation." *Id.*[15] However, the

---

**15.** In its complaint, plaintiff alleged that the defendant's "refusal to count detention and delay hours will cost the Association approximately $430,791.95 in compensation for pilotage services." Compl. ¶ 14. Although the Supreme Court has held "that a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action[,]" *Abbott Laboratories*, 387 U.S. at 154, 87 S.Ct. 1507 (citations omitted), it is also true that financial considerations may be taken into account when determining whether judicial review is warranted. *See id.* ("[T]here is no question in the present case that petitioners have sufficient standing as plaintiffs: the regulation is directed at them

in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition of strong sanctions.") (citation omitted). However in this case, the Court concludes that because the defendant has granted plaintiff the interim relief plaintiff sought to mitigate its financial loss, and because there is no allegation that plaintiff has had to make "significant changes" to its "everyday business practices" or faces the imposition of sanctions as a result of the defendant's behavior, review of the detention and delay hours issue is not justified at this time. *Cf. Abbott Laboratories*, 387 U.S. at 153, 87

Court concludes that any hardship suffered by plaintiff has been mitigated by the defendant's return to the rates that were in effect prior to the current Final Rule, the precise interim relief that plaintiff itself requested. In addition, because the defendant is currently engaged in further administrative consideration of how to deal with the issue of detention and delay hours, the precise relief that the Court would need to provide to plaintiff is uncertain. Therefore, the Court concludes that plaintiff may, if the defendant takes the position to treat the districts differently on the subject or to categorically exclude such hours in its future Final Rule, then file a challenge to that decision in this Court. *See State Farm,* 802 F.2d at 481 (holding that parties' challenge to portion of Final Rule that provided for recision of the rule's requirement that automobiles contain passive restraints if by [a designated date], two-thirds of the United States' population was covered by mandatory seatbelt usage laws meeting specified criteria, was not ripe for judicial review. "On the record before us, it appears singularly unlikely that the passive restraint standard will be rescinded by 1989. Failure to rescind the standard at that time would, of course, render the assault on the provision moot. Since it appears unlikely that the 'trap door' will ever be opened, a decision on

this issue may very well prove unnecessary."). Finally, it is noteworthy that plaintiff will not suffer any immediate and direct injury as a result of the Court's refusal to address this issue at this time. *Cf. Abbott Laboratories,* 387 U.S. at 153, 87 S.Ct. 1507 (holding that pre-enforcement challenge to regulation that would have required the plaintiff drug manufacturers to "make significant changes in their everyday business practices[,]" by including the "proprietary name" and "established name" of their drugs on all labels and advertisements for prescription drugs, was ripe for review. "Where the legal issue is fit for judicial resolution, and where a regulation requires *an immediate and significant change* in the plaintiffs' conduct of their affairs *with serious penalties attached to noncompliance,* access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted ...") (emphasis added). Accordingly, the Court concludes that the issue regarding the defendant's decision to exclude delay and detention hours in District Two is not ripe for judicial review.

For all of these reasons, the Court will dismiss, without prejudice,[16] plaintiff's challenge to the Final Rule regarding the

---

S.Ct. 1507 (holding that pre-enforcement challenge to regulation that would have required the plaintiff drug manufacturers to "make significant changes in their everyday business practices[,]" by including the "proprietary name" and "established name" of their drugs on all labels and advertisements for prescription drugs, was ripe for review).

**16.** In dismissing these claims, the Court will construe the defendant's pleadings regarding mootness as seeking relief pursuant to Federal Rule of Civil Procedure 12(b)(1), which pertains to dismissal for lack of subject matter jurisdiction. Even though the defendant has not styled its pleadings as a motion for dismissal on Rule 12(b)(1) grounds, the Court

has an independent obligation to assure itself that it has jurisdiction to address the issues presented to it. *Wyoming Outdoor Council v. United States Forest Service,* 165 F.3d 43, 47 (D.C.Cir.1999) ("At the most elemental level, the constitutional minimum for the exercise of our jurisdiction is a dispute presenting a justiciable 'case or controversy.' ") (citing U.S. Const. art. III, § 2; *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Therefore, "the ripeness requirement dictates that courts go beyond constitutional minima and take into account prudential concerns which in some cases may mandate dismissal ..." *Id.* at 49.

exclusion of detention and delay hours in District Two.

## C. Standard of Review

The Court will now address plaintiff's remaining substantive challenges to the 2001 Final Rule. Review of the defendant's 2001 Final Rule, "as the product of an informal agency rulemaking subject to the notice and comment procedures of . . . the Administrative Procedure Act . . ." is governed by the standard of review found in 5 U.S.C. § 706(2)(A) (2000). *American Pilots' Assoc. v. Gracey,* 631 F.Supp. 827, 831–32 (D.D.C.1986). In reviewing the actions of the defendant, the first inquiry the Court must make is "whether the [GLPO] acted within the scope of [its] authority." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citation omitted). After determining whether or not the GLPO has acted within the scope of its authority, the Court must then decide, pursuant to 5 U.S.C. § 706(2)(A), whether "the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 416, 91 S.Ct. 814 (quoting 5 U.S.C. § 706(2)(A)); *MD Pharm., Inc. v. DEA,* 133 F.3d 8, 16 (D.C.Cir.1998) (same). In reaching its conclusion regarding this second question, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (citation omitted). Finally, the Court must determine whether "the [GLPO's] action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. 814. Although the Court must make a detailed inquiry into the facts and circumstances underlying the defendant's actions, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. 814. However, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. Arkansas–Best Freight System. Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted). Therefore, as the District of Columbia Circuit has clearly held, "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [this Court] must undo its action." *Petroleum Communications, Inc. v. F.C.C.,* 22 F.3d 1164, 1172 (D.C.Cir.1994) (citation omitted). And, summary judgment should only be granted where there exists "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The scope of the review this Court is permitted to undertake is contested by the parties in their pleadings. The general rule is that "the focal point for judicial review [,in cases governed by the APA,] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *see also Citizens to Preserve Overton Park,* 401 U.S. at 420, 91 S.Ct. 814. Plaintiff has submitted a number of declarations with its motion for summary judgment, four of which "set forth objective, factual information concerning key issues . . . that the GLPO completely failed to address on the Administrative record." Pl.'s Reply at 5. The fifth declaration, plaintiff argues, "sets forth basic facts about the first mates' union contract . . . whose compensation is required by the regulation to be used for the calculation of the targeted rate of compensation." *Id.* Plaintiff argues that con-

sideration of these declarations is proper where it is apparent that "the agency failed to consider factors relevant to its decision; or where the agency considered evidence that it failed to include in the record." Pl.'s Mem. at 6 (citing *Esch v. Yeutter*, 876 F.2d 976, 991–92 (D.C.Cir. 1989)). Plaintiff further argues that "[t]he administrative record does not contain essential information necessary to compare bridge hours accurately, nor to establish accurate target pilot compensation. These are core issues in this case, and the GLPO's failure to include this information demonstrates that is has relied on an incomplete record." *Id.* at 7 (footnote omitted). Defendant counters, arguing that there are "four well established narrow exceptions to the rule limiting review to the final administrative record[,]" and plaintiff has failed to demonstrate that any of these four exceptions apply to the present case. Def.'s Opp'n at 2.

Plaintiff relies upon *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989), and other cases, for its position that the Court should consider the declarations it has submitted. In *Esch*, the District of Columbia Circuit acknowledged that "it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective .. [p]articularly ... [where] the procedural validity of the [agency's] action ... remains in serious question." *Id.* at 991. The court in *Esch* found that the agency had made a number of procedural deficiencies, such as failing to comply with its own hearing requirement, which justified supplementation of the record in that case. *Id.* at 992. However, the court acknowledged that "the familiar rule that judicial review of agency action is normally to be confined to the administrative record ... exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny." *Id.* at 991.

Plaintiff does not dispute the agency's procedure in promulgating the 2001 Final Rule. Rather, the focus of its challenge is the substantive determinations made by the defendant that underlie the adoption of the rule. The Court therefore concludes that the situation confronted here is significantly different from the one confronted by the *Esch* court because in the present controversy before the Court, the plaintiff is not alleging that the defendant committed procedural violations when it promulgated the 2001 Final Rule.[17] As discussed, *infra* at 27–42, the Coast Guard's record here, particularly its justifications for its actions, are thoroughly set forth in the NPRM, SNPRM, and the 2001 Final Rule. And, although plaintiff argues that the agency did not consider factors relevant to its decision, the Court finds that the agency did consider relevant factors and offered justification for why it considered other factors, specifically those factors related to the calculation of first mates' ben-

---

**17.** The *Esch* court actually delineated eight exceptions to the general rule that review in an APA case is limited to the administrative record that was before the agency at the time the decision was rendered. 876 F.2d at 991. These include:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to make a take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Id.* (footnote containing citations omitted).

efits, discussed later, *infra* at 27–31.[18] Therefore, the Court will not consider the materials submitted by the plaintiff but will confine its review to the administrative record that was before the agency at the time it rendered its decision.[19]

## D. *The Parties' Substantive Arguments*

In its motion for summary judgment, plaintiff argues that the defendant committed errors in three main areas when promulgating the 2001 Final Rule, which makes the adoption of the rule, in plaintiff's view, arbitrary and capricious. First, plaintiff argues that the defendant's calculation of the targeted rate of compensation for its pilots, *i.e.*, "the average amount of compensation each pilot is supposed to receive[,]" Pl.'s Mem. at 14, is arbitrary and capricious because the defendant used incorrect benefits figures for first mates and failed to include benefits in the definition of compensation. *Id.* at 15. Second, plaintiff argues that the defendant acted arbitrarily and capriciously by failing to include the Association's cash assets when calculating the Association's investment base. *Id.* at 20–21. Finally, plaintiff contends that the defendant erred when it ignored the Association's subsistence expenses. *Id.* at 20–21.

In its motion for summary judgment, defendant makes several general arguments. First, defendant notes that because this case is brought pursuant to the APA, this Court must give deference to the agency's interpretation of its own regulations. Def.'s Mem. at 6. Second, defendant states that three of the four reasons Lake Pilots disagrees with the 2001 Final Rule concern the definitions the Coast Guard has assigned to the terms "compensation" and "investment base." *Id.* at 7. Although conceding that some of Lake Pilot's interpretations of these terms find some support in the regulations, the defendant argues that its interpretations of those terms are not arbitrary, capricious or contrary to law and should be accorded deference. *Id.* at 7–12. Regarding the issue raised by Lake Pilots concerning the Coast Guard's denial of the Association's subsistence expenses, the defendant argues that because the Coast Guard never addressed this issue in the 2001 Final Rule and, as "the decision to partially disallow the subsistence expenses had no impact on the final pilotage rates[,]" the Court should enter summary judgment in defendant's favor regarding this claim. *Id.* at 13. The Court will address each of the plaintiff's challenges to the 2001 Final Rule in turn.

### 1. Targeted Rate of Compensation

Plaintiff contests defendant's determination regarding target pilot compensation. Compl. ¶ 12. "Target Pilot Compensation" is defined as "the compensation that pilots are intended to receive for full time employment." 46 C.F.R. Pt. 404, App. B. Plaintiff argues that defendant erroneously applied this regulation in two respects.

---

**18.** In addition, because the focal point of plaintiff's declarations address the issue of the defendant's "discriminatory change in treatment of detention and delay hours[,]" Pl.'s Reply at 5, an issue which the Court has concluded is not ripe for review, *see supra* at 16–22, consideration of these factors is not necessary at this juncture.

**19.** In any event, because, as discussed, *infra* at 30–31, the Court has determined that por-

tions of the 2001 Final Rule are arbitrary and capricious, the Court finds it unnecessary to supplement the administrative record at this time. *See Carlton v. Babbitt*, 26 F.Supp.2d 102, 108 (D.D.C.1998) ("Since there will be a remand on this issue, the Court need not supplement the record with these documents now, but it assumes that the agency will consider them[ ]" following the removal).

First, plaintiff argues that the "GLPO used certain benefit figures for first mates under the collective bargaining contract that were simply incorrect[,] ... includ[ing] the raw numbers as well as the manner in which the union contract is administered with respect to these benefits." Pl.'s Mem. at 15. One reason for this error, plaintiff surmises, is that there are no copies of any collective bargaining contracts or contribution schedules on the official docket, which plaintiff claims "generally were not disclosed until [after] the [F]inal [R]ule was published." *Id.* Therefore, plaintiff argues that it is not "apparent" what the GLPO relied upon in obtaining the figues regarding the "wages and benefits received by first mates." *Id.* (quoting 46 C.F.R. § 404(1) App. A, Step 2.A). Second, plaintiff contends that the GLPO erred in determining the target pilot compensation for pilots in designated waters by applying the 150% multiplier solely to the wages first mates received and not the "total compensation" received by first mates, which plaintiff argues includes both wages and benefits. *Id.*

■ Plaintiff's first argument, that defendant relied upon inaccurate data in computing the target rate of compensation for first mates, is the easier of the two challenges to resolve. In plaintiff's comments filed with the defendant on October 12, 2000, it identified the April 14, 2000 NPRM and the September 13, 2000 SNPRM as utilizing the 1999 American Maritime Officers Union contract as the basis for target pilot compensation. Administrative Record ("Admin.R.") at 00120 [20] (Lake Pilots Association, Inc.'s Response to Supplemental Notice of Proposed Rulemaking, dated September 13, 2000). However, in its summary judgment motion, plaintiff argues that the defendant did not rely on the figures utilized in the American Maritime Officers Union contract, which they say appears to have resulted in the GLPO erroneously assuming that the daily cost of providing first mates benefits was $13.97, when the daily cost in June 2000 was actually $37.81. Pl.'s Mem. 16–17.

In its opposition, defendant states that "the administrative record shows that the source for the monthly clerical, medical, and pension information is a ship operating company, not the union contract." Def.'s Opp'n at 5. Defendant contends that "[u]sing the shipping company as a source for data is reasonable because the shipping company actually pays the benefits, and benefits vary depending on how many days are actually worked." *Id.* Although defendant cites to the administrative record, specifically to the Director Great Lakes Pilotage 1999 Rate Review, page 6, the figures relied on were, according to the declaration of Brian Judge, Commander of the United States Coast Guard, which is attached to the administrative record, "not published in the public docket." Admin. R. at 1 ¶ 4 (Declaration of Brian Judge, Commander United States Coast Guard). Therefore, according to the Judge declaration, plaintiff, and other members of the public, were made aware of the "working papers" that formed the basis of the defendant's calculation of the amount of benefits received by first mates. *Id.*

However, the Final Rule does not explicitly state upon which contract the defendant relied in determining the amount of benefits received by first mates. The Rule states, in part:

> The daily rate of wages specified in the first mates' union contract, effective Au-

---

**20.** References to page numbers of the administrative record are to the pages as re-numbered by the defendant. Documents pertaining to this rulemaking can be found in public docket number 6098 and can be accessed through the internet at http://dms.dot.gov.

gust 1, 1999, was $179.42.... Added to this figure are the monthly costs of first mates' pensions, of $1,246; their medical care, of $426, and their clerical support, of $126. The monthly total of wages and benefits comes to $11,487.

66 Fed.Reg. at 36,487. It is only in the Administrative Record, and the portion that was not disclosed to the public, where it is indicated, with an asterisk, that the monthly clerical, medical, and pension figures were derived from the Ship Operating Company. Admin. R. at 00364. This accounts for the discrepancy between the figures utilized by plaintiff and those utilized by defendant.

Thus, the issue becomes whether the 2001 Final Rule is arbitrary and capricious because defendant did not disclose the actual figures of the ship operating company and indeed, did not state that it was relying on this source to determine the cost of the first mates' benefits. Although the NPRM issued on April 14, 2000 states that "the target rate of compensation is equal to the average yearly compensation earned by first mates on U.S. Great Lakes vessels [, it also states that] [e]ffective August 1, 1999, the rate is $103,644, according to information from the American Maritime Officers Union and Great Lakes Ship Operating Companies." 65 Fed.Reg. at 20,-115. What is significant is that this notice did not indicate that the figures for the costs of benefits would be exclusively derived from a ship operating company. Nor does the defendant explain, in the NPRM, the SNPRM, or the 2001 Final Rule, exactly why the benefits figures were totally derived from a ship operating company, while the monthly rate for target pilot compensation (which included work days, vacation, weekend, holiday and bonus pay compensation) was taken from the American Maritime Officers First Mate Contract. Admin. R. at 00364.

The Court cannot reconcile the GLPO's exclusive use of figures derived solely from a ship operating company with the language of the Coast Guard's applicable regulation. 46 C.F.R. Pt. 404, App. A (Step 2.A) provides that the "average compensation for first mates is determined based on *the most current union contracts,* and includes wages and benefits received by first mates." In addition, 46 C.F.R. § 404.5 (Guidelines for the recognition of expenses) provides:

> Medical, pension, and other benefits paid to pilots, or for the benefit of pilots, by the Association are treated as pilot compensation. *The amount recognized for each of these benefits is the cost of these benefits in the most recent union contract for first mates on Great Lakes vessels. Any expenses in excess of this amount are not recognized for ratemaking purposes,*

(emphasis added). This provision is further support for the conclusion that the costs associated with a first mates' benefits are determined by referencing the most recent union contract. Defendant's rationale for utilizing the figures obtained from the ship operating company, *i.e.,* "because the shipping company actually pays the benefits," does not comport with its obligation to use the costs in the most recent union contract. But, even assuming that reference to the ship operating company's figures is not arbitrary and capricious because the company actually pays the benefits, the Court cannot sanction the Coast Guard's *post hoc* rationalization for the action it took when the administrative record is devoid of any such rationalization. *See Motor Vehicle Mfr. Assoc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("[C]ourts may not accept ... counsel's *post hoc* rationalizations for agency action ... It is well-established that an agency's

action must be upheld, if at all, on the basis articulated by the agency itself."); *see also D & F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196 (D.C.Cir.2000) (holding that determination made by the Federal Aviation Administration's issuance of a determination that the roof of plaintiff's house was a 'navigational hazard' was arbitrary and capricious. "Nowhere in the record before us can we find a link between established hazard determination standards and the hazard determination reached by the FAA in this case.... The FAA's post hoc rationalizations for deviating from procedure and for failing to substantiate its hazard determination cannot pass muster as a matter of law."); *MCI Worldcom, Inc. v. General Services Admin.*, 163 F.Supp.2d 28, 37 (D.D.C.2001) (holding that defendant's failure to adhere to its own FOIA regulations was arbitrary and capricious where failure to adhere to procedures deprived plaintiffs of "the opportunity to submit any comments as to how disclosure of the ... pricing data ... would cause substantial competitive harm or why they should otherwise remain confidential."). Given the defendant's failure to adhere to the language of its own regulations, provide notice to interested parties regarding the alternative source of the data it would use, or to provide in the administrative record any justification for its reliance on the figures it used to make

its calculations, this Court must conclude that the defendant's reliance on the ship operating company's figures was arbitrary and capricious. *See Motor Vehicle Mfr. Assoc.*, 463 U.S. at 48–49, 103 S.Ct. 2856 ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner ...") (citations omitted).[21]

■ Plaintiff also challenges the 2001 Final Rule's calculation of target rate of compensation for designated waters on the basis that the defendant did not apply the 150% multiplier for determining the target rate of compensation in designated waters to the compensation of first mates, which plaintiff argues includes both wages and benefits. Resolution of this second challenge is more difficult than the resolution of the challenge just addressed.

As part of the Final Rule published in 1997, the Director announced that the salary of a master[22] "was defined as '1.5 times mate salary plus mate benefits.'" Def.'s Mot. at 4. Pursuant to 46 C.F.R. § 404, App. A, Step 2.A ("Determination of Target Rate of Compensation"):

(1) Target pilot compensation for pilots providing services in undesignated waters approximates the average annual compensation for first mates on U.S. Great Lakes vessels. The average annual compensation is determined based on the most current union contracts, and

---

**21.** The Court is not holding that the defendant may never rely on a ship operating company's costs as the source for calculating the benefit figures of first mates. However, what the Court is saying is that if the Coast Guard interprets its regulations to permit it to use such costs, then "[t]he agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfr. Assoc.*, 463 U.S. at 52, 103 S.Ct. 2856 (citation omitted). But, to "pass muster under the arbitrary and capricious standard[,]" *id.* at 56, 103 S.Ct. 2856, the agency must provide "a rational connection between the

facts found [*i.e.*, the accuracy and preferability of relying on a ship operating company's benefit figures as opposed to the figures contained in the union contract] and the choice made." *Id.* at 52, 103 S.Ct. 2856 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

**22.** A "master" is the licensed mariner who is in charge of the merchant's vessel. Def.'s Mem. at 3 n. 2. The first mate is the licensed mariner next in seniority to the master. *Id.*

includes wages and benefits received by first mates.

(2) Target pilot compensation for pilots providing services in designated waters approximates the average annual compensation for masters on U.S. Great Lakes vessels. It is calculated as 150% of the compensation earned by first mates on U.S. Great Lakes vessels.

As is apparent by the parties' conflicting interpretations of this regulation, the Court finds that the regulation is ambiguous. Regarding undesignated waters, the regulation provides that the target pilot compensation "includes wages and benefits." For designated waters, the target pilot compensation is 150% of the "compensation" received by first mates. Both parties acknowledge that the 2001 calculation of the target rate of compensation for pilots on the Great Lakes is derived from the process used to determine the 1997 rates. The 2001 Final Rule states, in part:

[T]arget pilots' compensation for designated waters should at least approximate 1.5 times that for undesignated waters. This is so because the former should be 1.5 times first mates' salary plus first mates' benefits, as explained in a final rule published in the Federal Register on February 10, 1997 [62 FR 5217].

The 2001 Final Rule further provides:

The daily contractual rate of wages for first mates is multiplied by 54 to determine the monthly rate for undesignated waters. This monthly rate is then multiplied by 1.5 to determine the monthly rate for designated waters (monthly rate for undesignated waters × 1.5 = monthly rate for designated waters). *Only then is the cost of benefits (pensions, medical care, and clerical support) added to the monthly rates for both undesignated and designated waters.* These figures are then multiplied by 9 to yield total yearly target pilots' compensation. . . .

66 Fed.Reg. at 36,487 (emphasis added).

In arguing that the 1.5 multiplier should be applied to the total of both a first mate's wages and benefits, plaintiff ignores the defendant's reasoning for only adding the costs of benefits after the first mates' wages alone have been multiplied by 1.5. This rationale was explained in the promulgation of the 1997 Final Rule wherein it was stated:

Three commenters disagreed that master compensation was 1.5 times all salary and benefits as proposed in the NPRM. Commenters provided detailed information, including W–2 tax information, showing that a more accurate approximation of master wages is 1.5 times mate salary, plus mate benefits. . . . *After reviewing the available figures, the SLSDC believes that master salary is closest in comparison to 1.5 times mate salary, plus mate benefits.*

62 Fed.Reg. 5917, 5920 (February 10, 1997).

Clearly, the purpose of the regulation's calculation of the target pilot compensation on designated waters is to approximate it, as closely as possible, to the salary of masters. 46 C.F.R. § 404, App. A, Step 2.A. In the 1997 rulemaking, it was determined, after review of the pertinent financial information, that the salary masters received was most closely calculated at 150% of the salary of first mates plus the benefits such mates received. This justification is reasonable. As argued by the defendant in its summary judgment motion, the purpose of the regulation pertaining to target pilot compensation "is to keep the pilots' income comparable to private masters and first mates operating domestic vessels on the Great Lakes with similar responsibilities." Def.'s Mem. at 7 (citing 59 Fed.Reg. 17,303, 17,308). While the

target compensation of pilots in undesignated waters equates with the compensation of first mates who work on United States Great Lakes vessels, the target compensation for pilots in designated waters is based on the compensation of masters. *Id.* However, because the contracts of masters are not readily available, "in creating its ratemaking methodology, the Coast Guard decided to set the target compensation in designated waters at 150% of the compensation of first mates, rather than attempting to determine the actual average compensation of Great Lakes masters." *Id.* at 8 (citing 46 C.F.R. Part 404, App. B). Plaintiff argues, however, that defendant may not rely on its 1997 Final Rule as justification for its current position because that rule was the product of a delegation by the Secretary of his authority to promulgate rates, which the District of Columbia Circuit held to be an improper delegation in *Halverson v. Slater*, 129 F.3d 180 (D.C.Cir.1997).[23]

Plaintiff is correct that the Court does not have to give deference to interpretations not made by an agency. However, this does not preclude the Court from reviewing the agency's justification for taking a course of action in determining whether the action itself is reasonable. Having made that assessment here, the Court concludes that the formula used by the Coast Guard to determine the targeted rate of pilot compensation was reasonable. Congress has delegated to the Secretary of Transportation the authority "to prescribe regulations for the ... manning of vessels ... that may be necessary for increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment." 46 U.S.C. § 3703. The Secretary has delegated this authority to the Commandant of the Coast Guard pursuant to 46 U.S.C. § 2104, who has in turn delegated his authority to the Director of the GLPO in the implementing regulations found at 46 C.F.R. Parts 401–404. "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *American Pilots Assoc., Inc.*, 631 F.Supp. at 830

**23.** As discussed above, in its opposition to defendant's motion for summary judgment, as it relates to targeted pilot compensation, plaintiff argues that to the extent the Coast Guard's current position regarding targeted pilot compensation is consistent with the position taken during the 1997 ratemaking process, the current position is legally flawed due to the fact that the 1997 rates were not "valid regulatory interpretations" because they were established by the Saint Lawrence Seaway Development Corporation ("SLSDC") after the Secretary of Transportation improperly delegated his authority to that body, as was held by the District of Columbia Circuit in *Halverson v. Slater*, 129 F.3d 180 (D.C.Cir. 1997). Pl.'s Opp'n at 10. However, interestingly, in making its argument in support of its position that the exclusion of detention and delay hours was arbitrary and capricious, plaintiff notes that detention and delay hours were included in the 1997 rule. Pl.'s Mem. at

9. It appears that plaintiff would have the Court hold the Coast Guard to the 1997 rates for purposes of determining the detention and delay hours issue but to disregard those same rates when determining pilot targeted compensation. In any event, the District of Columbia Circuit did not go so far in *Halverson* as to find the 1997 rates invalid nor does it appear that a specific challenge to the rates was made in that case. What the *Halverson* court held is that the Secretary of the Department of Transportation "lack[ed] authority to delegate GLPA powers and duties to the Corporation[,]" and it vacated the 1995 Final Rule in which this authority had been delegated. 129 F.3d at 189. Therefore, for this Court to hold that the 1997 rates were *per se* invalid, absent a direct challenge to those rates, would transcend the boundaries of the review this Court has been called upon to undertake.

("Where Congress delegates the interpretation of the statute explicitly, regulations adopted by the agency interpreting the statute's terms have legislative effect. Such regulations may be set aside only if the Coast Guard exceeded its statutory authority or if the regulation is arbitrary, capricious, an abuse of discretion, or not in accordance with law.") (citation omitted). Although this Court is not confronted with a *Chevron* situation, *i.e.*, an agency's interpretation of a statute it administers, it is beyond dispute that an agency's interpretation of its own regulations are entitled to deference when the regulation is capable of two potential interpretations. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations omitted); *see also Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (stating that "*Auer* deference is warranted only when the language of the regulation is ambiguous."). So long as the defendant's interpretation of the regulation is not " 'plainly erroneous or inconsistent with the regulation' " its interpretation is "controlling." *Auer*, 519 U.S. at 461, 117 S.Ct. 905 (citations omitted).

Plaintiff would have the Court invalidate defendant's interpretation of its regulations because of the defendant's reliance on the 1997 rule, which was promulgated pursuant to an improper delegation of authority. But, in the Final Rule at issue, aside from its reliance on the 1997 Rule, defendant articulates why the benefits amount is only added to the figure derived from multiplying the amount of the wages by 1.5, rather than multiplying the sum of both the benefits and wages amounts by 1.5. In any event, the defendant is entitled to consider the reasoning and justifications proffered by interested parties. Authorization to do so is provided by 46 U.S.C. § 3703(c), which provides in part:

> [i]n prescribing regulations ... the Secretary shall establish procedures for consulting with, and receiving and considering the views of—... (3) representatives of port and harbor authorities and associations; ...and (5) other interested parties knowledgeable or experienced in dealing with problems involving vessel safety, port and waterways safety, and protection of the marine environment.

It has not been suggested that the Saint Lawrence Seaway Development Corporation ("SLSDC") is not a party from which views can be received and considered by the Coast Guard. It was therefore not inappropriate for the defendant to adopt the reasoning underlying the 1997 rule as the basis for adopting the formula contained in the current rule. Accordingly, based on of the justification proffered for the adoption of the current rule, the Court cannot conclude that the defendant's interpretation of how to apply its regulations in this instance is arbitrary and capricious. *See Auer*, 519 U.S. at 461, 117 S.Ct. 905 (rejecting petitioners' argument that Secretary of Labor's interpretation of his regulation was not entitled to deference because it was made in the Secretary's legal briefs. "The Secretary's position is in no sense a *'post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack[.] There is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question."); *Drake v. Federal Aviation Admin.*, 291 F.3d 59, 67–68 (D.C.Cir. 2002) (rejecting argument that agency's interpretation, which was never expressly advanced by the agency when it rejected the petitioner's request, was unreasonable. "Recent decisions of this court make it clear that we owe deference to an agency's interpretation advanced during litigation regarding the meaning of an ambiguous regulation, if the position is not inconsis-

tent with the agency's prior statements and actions regarding the disputed regulation.... The [Federal Aviation Administration's] interpretation here is consistent with the position the agency took in its NPRM and offers a perfectly reasonable interpretation of [its regulation], one to which we defer.") (citations omitted).

There is nothing to indicate that defendant did not review the reasoning set forth in the 1997 rule and concluded that the analysis for the adoption of that rule was sound. Defendant's reliance on the reasoning set forth in the 1997 Rule, although made by an organization that was improperly delegated the authority to promulgate the Rules, is not arbitrary and capricious where defendant has articulated its reasoning as support for the current rule and the parties have had an opportunity to comment on this reasoning. *See Auer,* 519 U.S. at 462, 117 S.Ct. 905 (upholding Secretary of Transportation's interpretation of its own regulation where nothing in the record evidenced that the agency did not engage in "fair and considered judgment on the matter in question."); *Drake,* 291 F.3d at 67–68 (upholding agency's interpretation of its regulation where the interpretation was "consistent with the position the agency took in its NPRM and offer[ed] a perfectly reasonable interpretation" of the regulation). Therefore, defendant is entitled to summary judgment on this aspect of plaintiff's complaint.

### 2. Calculation of the Investment Base

██ Next, plaintiff argues that the 2001 Final Rule is arbitrary and capricious "because it disregards the regulation's requirement that cash be included when calculating the Association's investment base." Pl.'s Mem. at 20. The regulation plaintiff references, 46 C.F.R. pt. 404, App. A (Step 4) ("Calculation of Investment Base"), provides, in part:

The investment base is the recognized capital investment in the assets employed by each Association required to support pilotage operations. *In general, it is the sum of available cash* and the net value of real assets, less the value of land. The investment base will be established through the use of the balance sheet accounts, as amended by material supplied in the Notes to the Financial Statement.

(emphasis added). Plaintiff's position that the defendant's calculation of its investment base is arbitrary and capricious is based on the defendant's failure to include cash in the Association's investment base, which plaintiff claims conflicts with the defendant's own definition of investment base, which is described as being "the sum of available cash and the net value of real assets ..." Pl.'s Mem. at 20. Plaintiff argues that defendant ignored the language of the regulation and "refused to include cash from the Association's investment base." *Id.* at 21. In support of its exclusion of cash, defendant stated in the 2001 Final Rule that "the Coast Guard only considers property and equipment, because cash assets held on deposit earn interest." *Id.;* 66 Fed.Reg. at 36, 487. Plaintiff argues that "the fact that the Association can earn interest on its cash deposits—is irrelevant.... Had the drafters of the regulation wanted to exclude such accounts, they would have done so. They did not, and the GLPO's contrary interpretation is not permitted." Pl.'s Mem. at 21. The Court agrees.

In the 2001 Final Rule defendant justified its exclusion of certain cash from plaintiff's investment base, stating:

46 CFR part 404, Appendix A, Step 5(3) states that 'Assets subject to return on investment * * * must be reasonable in purpose and amount. If an asset or

other investment is not necessary for the provision of pilotage services, that portion of the return element is not allowed for ratemaking purposes. In calculating the rate of return the Director considers property and equipment because cash assets held on deposit earn interest. A significant portion of the large cash balances that pilots' associations accumulate at the end of the calendar year they immediately distribute the next year as pilots' compensation during the months that the St. Lawrence Seaway is closed. Director's including cash assets would encourage these associations to unnecessarily inflate their investment bases and provide a source of return available to few if any other private businesses. As we explained in the SNPRM, analysis of pilots' associations' investment bases indicates that, ever since the concept of return on investment was introduced into the ratemaking methodology, Districts [Two] and [Three] have greatly increased their bases. In District [Two] the base went from \$265,488 in 1995 to \$413,998 in 1996, of which only \$116,041 represented property and equipment.

66 Fed.Reg. at 36487. The Court does not dispute that the defendant may have a legitimate reason for wanting to exclude cash from the Association's investment base. If the defendant intended to modify the regulation as to what constitutes the investment base, then the proper course would have been for it to amend the regulation after providing the appropriate opportunity for notice and comment. *See* 5 U.S.C. § 553; *see also Batterton v. Marshall,* 648 F.2d 694, 704 (D.C.Cir.1980) ("The essential purpose of according [§ ] 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies."). The requirement of notice and comment, however, is not accomplished by advising a party in a separate Final Rule that its investment base will be calculated in a manner inconsistent with an existing regulation. *See id.* at 711 (holding that any "future modifications" to agency's methodology for calculating unemployment rates "must be promulgated with advance publication by notice, opportunity for public comment and final publication at least 30 days prior to effective date."). Currently, and in 2001, the regulations define the investment base as "recognized capital investment in the assets employed by [an] Association that are required to support pilotage operations." 46 C.F.R. pt. 404, App. A (Step 4). And the regulation goes on to state that "[i]n general, [the investment base] is the sum of available cash and the net value of real estate, less the value of land." *Id.* Nowhere in the regulations is it stated that cash assets are categorically excluded from the investment base solely because "cash assets held on deposit earn interest." SNPRM, 65 Fed.Reg. at 55,209. Rather, the direct opposite is the case. In addition, 46 C.F.R. pt. 404, App. B, defines investment base as "the net recognized capital invested in the Association, including both equity and debt. Should capital be invested *in other than pilotage operations, that capital is excluded* from the rate base." (emphasis added). The term "capital" clearly includes cash, as Webster's dictionary states that a permissible definition of capital is "available money." Webster's Third New International Dictionary 332 (3d ed.1981). And the language of 46 C.F.R. pt. 404, App. B unequivocally provides that capital is only excluded from the investment base if it is not invested in pilotage operations; no other exception is provided in the regulation. Nevertheless, in its summary judgment motion, defendant states that Lake Pilots "points to the

language stating that generally cash is included in the investment base; however, it does so without explaining how the cash is necessary to the provision of pilotage services." Def.'s Mem. at 11. The problem with this position is that the defendant does not base its decision to exclude cash from the Association's asset base on the ground it is used for purposes other than pilotage operations.[24] Thus, because the regulation provides that cash can be part of the investment base, the Court reads the regulation as requiring that it be included if the cash is used to support pilotage operations. It is only when cash is not used for pilotage operations that the defendant may exclude cash from the investment base, and not for a reason not expressed in the regulations. Defendant points to nothing in the regulations, or the Great Lakes Pilotage Act itself, that would justify the exclusion of cash for the reason articulated by the defendant. *See MCI Worldcom, Inc.*, 163 F.Supp.2d at 37 (holding that agency action was arbitrary and capricious where agency made decision "without adhering to any of its own . . . regulations . . ."). Therefore, the Court concludes that the defendant's decision to exclude categorically cash assets from the plaintiff's investment base was arbitrary and capricious.

### 3. Denial of Subsistence Expenses

Although the plaintiff challenged the denial of certain subsistence expenses of the defendant during its rulemaking process, *see* Compl. ¶ 12, it failed to address the issue in its motion for summary judgment. *See* Pl.'s Mem. at 7 ("While the Association pointed out many errors in the GLPO's

proposed rates in the course of the administrative proceedings, it takes issue with only three of those factors in this proceeding— Number of Pilots (or Manpower) (Step 2B); Target Pilot Compensation (Step 2A); and Investment Base (Step 4)."). However, defendant, in its motion to dismiss raised the issue and plaintiff responded to it in its opposition to defendant's motion. Therefore, the Court will briefly address the issue.

Regarding the denial of District Two's subsistence expenses, the Final Rule provided:

> The District [Two] Pilot's Association and its accounting firm disagree with the deduction of amounts for daily subsistence that did not conform to guidelines of the Internal Revenue Service. 46 CFR Part 404.5 establishes those guidelines as one of the tests used to determine the reasonableness of an expense. For 1997 those guidelines fix $36 a day as the maximum allowable amount of daily subsistence. Pilots in District [Two] were paid $40, as stated in the Pilot Association's accounting handbook and confirmed by the District's chief dispatcher during the independent auditor's 1999 audit of the District. The amount in excess of $36, $2,484, we have deducted from the expense base of the District.

66 Fed.Reg. at 36,487. Interestingly, the defendant concedes in its motion to dismiss that it may have incorrectly disallowed some of the plaintiff's subsistence expenses. Nonetheless, defendant argues that the issue need not be addressed by

---

**24.** Interestingly, in the NPRM and SNPRM, the defendant was going to deduct $1,988.00, from the Association's expense base, which the Association expended for uniforms, because the expense was "not directly related to the provision of pilotage (46 CFR § 404.5)." 65 Fed.Reg. 55209 (SNPRM). However, the Director reconsidered this position, and the 2001 Final Rule provides that "the Director considers the $1,988 in uniform expense a necessary investment in equipment that enhances service and safety. Accordingly, he has returned the $1,988 to the District's expense base." 66 Fed.Reg. 36487.

the Court because any "error in calculating the subsistence expenses represents a little more than two-tenths of one percent of the total operating expenses. Consequently, the decision to partially disallow the subsistence expenses had no impact on the final pilotage rates." Def.'s Mem. at 13. The Court is not impressed with the defendant's position, but concludes that judicial review of the determination should not be made at this time. Defendant's "no harm, no foul" argument does not comport with its obligations under the APA. Having conceded a potential error in excluding some of plaintiff's subsistence expenses, the Court will remand this case to the defendant so it can reconsider its calculations of the pilotage rates issue using the actual subsistence expenses plaintiff was entitled to claim.

### E. Conclusion

As set forth above, the Court concludes that plaintiff's challenge to the defendant's exclusion of detention and delay hours in calculating the number of pilots to assign to plaintiff's district is not ripe for review. In addition, the Court concludes that certain aspects of the defendant's 2001 Final Rule are arbitrary and capricious. Namely, the defendant should not have exclusively relied on a ship operating company's benefits data as the basis for determining the amount of benefits to be included in its calculation of the target rate of pilot compensation; it should not have excluded cash from the Association's investment base on a basis not provided for in its regulations; and, having conceded to a possible error in denying some of the Association's subsistence expenses. Accordingly, this matter is remanded to the Coast Guard for further proceedings consistent with this opinion.

25. The Court issued its Order in which it ruled on the parties' respective motions on

An Order consistent with the Court's rulings accompanies this Memorandum Opinion.[25]